**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JiangSu CorEnergy Semiconductor Company Limited,<br><br>              Plaintiff,<br><br>v.<br><br>OEM Group, LLC et. al,<br><br>              Defendants. | No. CV-24-01675-PHX-DWL<br><br>**ORDER** |

     In 2019, the Chinese company JiangSu CorEnergy Semiconductor Co. Ltd. ("Plaintiff") contracted with Defendant OEM Group, LLC ("OEM") to purchase a complex piece of semiconductor manufacturing equipment.  In this action, Plaintiff alleges that although OEM timely delivered the equipment, OEM failed to complete installation and to honor the product's warranty.  Plaintiff has also sued Plasma-Therm LLC ("Plasma-Therm") under the theory that Plasma-Therm is now responsible—following a separate transaction between Plasma-Therm and OEM—for providing installation and warranty services under OEM's contract with Plaintiff.

     Notably, the primary relief that Plaintiff seeks in this action is not an award of damages based on the alleged contractual violations.  Instead, Plaintiff simply seeks an order under § 4 of the Federal Arbitration Act ("FAA") compelling both OEM and Plasma-Therm (together, "Defendants") to submit to an arbitration proceeding related to Plaintiff's contract claims.  (Doc. 19 ¶ 79(a).)  Only in the alternative does Plaintiff seek monetary relief.  (*Id.* ¶¶ 79(b)-(f).)

Now pending before the Court are Plaintiff's request to compel arbitration (Doc. 19), Plasma-Therm's motion to dismiss for lack of jurisdiction and failure to state a claim (Doc. 22), and OEM's motion to dismiss the portion of the complaint seeking to compel arbitration (Doc. 23). For the reasons that follow, Plaintiff's request to compel arbitration is denied (and, thus, OEM's motion to dismiss that request is granted) and Plasma-Therm's motion to dismiss is granted in part and denied in part.

## BACKGROUND

Because Plasma-Therm disputes personal jurisdiction, the Court will analyze the relevant jurisdictional facts in more detail in later portions of this order. The summary below, which is based on the allegations in the First Amended Complaint ("FAC"), is simply intended to provide an overview of the parties and Plaintiff's claims.

I.  Parties

Plaintiff "is a company organized under the laws of China with its registered business" in Jiangsu, China. (Doc. 19 ¶ 8.)

OEM "is a limited liability company organized under the laws of Delaware with its principal place of business" in Gilbert, Arizona. (*Id.* ¶ 9.)

Plasma-Therm "is a limited liability company organized under the laws of Florida." (*Id.* ¶ 10.) The parties dispute Plasma-Therm's principal place of business. (*Compare id.* [alleging that Plasma-Therm's principal place of business is in Gilbert, Arizona], *with* Doc. 22-1 ¶ 46 ["Plasma-Therm's place of formation and sole principal place of business is in the State of Florida."].)

II. The Contract

In 2019, Plaintiff and OEM "entered into a sales contract" (the "Contract") for the purchase of "certain semiconductor manufacturing equipment." (Doc. 19 ¶¶ 20-21.) As part of the Contract, OEM agreed to sell Plaintiff "the Eclipse ® Mark IV™ Metal Deposition System" (the "Eclipse") "configured with four PVD process chambers." (*Id.* ¶ 22.) The Contract also required OEM to complete various start-up processes "for the consideration of $16,000," and OEM "undertook to send engineers to China to complete

on-site installation of the Eclipse." (*Id.* ¶ 23.)  In addition, the Contract "provided that the time of shipment is 'within 26 weeks after down payment'" and stated that OEM "shall guarantee that the goods when duly and correctly mounted and properly operated and maintained, will give normal performance.  Warranty period shall be 6 months starting from shipment." (*Id.* ¶¶ 24, 26.)

Section 15 of the Contract contained a clause titled "Arbitration" ("Section 15"). (*Id.* ¶ 27.  *See also* Doc. 23-2 at 6.)  The clause is written in both English and Chinese and the English version states:

> All disputes in connection with this Contract or the execution thereof shall be settled friendly through negotiations.  In case no settlement can be reached through negotiations, the case shall then be submitted for arbitration to the Shanghai.  The arbitration shall take place in Beijing and the decision rendered by the said Commission shall be final and binding upon both parties; neither party shall seek recourse to a law court or other authorities for revising the decision.  The arbitration fee shall be borne by the losing party.

(Doc. 19 at 19.)  However, OEM has now submitted a certified translation of the Contract's Chinese text as an attachment to its motion papers.  (Doc. 23-2.)  This translation differs from the English version of the original Contract and states:

> All Disputes arising from or related to this Contract shall be resolved through amicable negotiations.  Should negotiations fail, disputes must then be arbitrated or litigated at a relevant arbitration institution or court in Shanghai, with the losing party responsible for the arbitration costs.

(*Id.* at 6.)  Section 16 of the Contract states that "[s]hould any difference occurred between the English and Chinese Languages used in the contract, the Chinese copy shall be taken as the principal." (Doc. 19 at 19.  *See also* Doc. 23-2 at 6 ["This contract is written in both Chinese and English.  In the event of any discrepancy, the Chinese version shall prevail."].

## II.    Breach Allegations And Plasma-Therm's Transaction With OEM

On June 6, 2019, Plaintiff made a down payment to OEM "equivalent to 70% of the order price." (Doc. 19 ¶ 28.)

On January 9, 2020, Plaintiff paid OEM an additional "20% of the Eclipse's order

price." (*Id.* ¶ 29.) Thereafter, "the Eclipse was delivered to [Plaintiff] with various manuals and components missing, including Chamber 3, an indispensable part of the normal operation of the Eclipse." (*Id.* ¶ 30.) In addition, OEM "failed to send engineers on site to complete installation of the Eclipse, which stayed inoperable." (*Id.* ¶ 31.) When Plaintiff complained of these problems to OEM's management, "[n]one of [Plaintiff's] requests were resolved by OEM Group." (*Id.* ¶¶ 32-34.)

"[O]n or around December 1, 2020, Plasma-Therm acquired OEM Group's dry process equipment business, including the Eclipse product line, in Arizona." (*Id.* ¶ 35.) "Specifically, on December 1, 2020, Plasma-Therm and OEM Group jointly issued a letter addressed to all of OEM Group's 'Valued Customers', entitled 'Continuation of Business Services (Plasma-Therm Acquisition of OEM Group's Dry Business)', which acquisition included the 'MRC Eclipse' product line." (*Id.* ¶ 37.) "The letter announced that 'Plasma-Therm has acquired all licenses and intellectual property rights to these OEM's. We have also assumed the responsibility to complete all open orders for spare parts, upgrades, refurbishments, and new system builds.'" (*Id.* ¶ 38.) The letter also provided that "most of the engineers, field service personal, product managers, and support team that has supported these products and your business, will now be part of the Plasma-Therm family" and provided instructions for contacting Plasma-Therm for companies with "an open PO . . . for spares, an upgrade, or a new system." (*Id.* ¶¶ 39-40.)

"In December 2020, [Plaintiff] and Plasma-Therm began engaging in the hope that OEM Group and Plasma-Therm would perform their obligations under the Contract." (*Id.* ¶ 42.) These discussions continued for two years. (*Id.* ¶ 43.) "After initially representing that they would cure, Plasma-Therm eventually claimed that Chamber 3 of the Eclipse was not actually included in the Contract." (*Id.* ¶ 44.)

As of October 2, 2024, "the Eclipse remains inoperable due to the lack of onsite installation support, and various missing components including Chamber 3." (*Id.* ¶¶ 45-46.) "As a direct result of Defendants' breaches, [Plaintiff] suffered production delays and substantial damages." (*Id.* ¶ 49.)

III.    <u>Procedural History</u>

On July 5, 2024, Plaintiff filed a complaint and initiated this lawsuit. (Doc. 1.)[1] The complaint alleged three counts. (*Id.* ¶¶ 37-58.) Count One alleged that Defendants breached the Contract under Articles 25 and 30 of the United Nations Convention on Contracts for the International Sale of Goods ("CISG"); Count Two alleged that Defendants breached the covenant of good faith and fair dealing; and Count Three alleged, in the alternative to the first count, that Defendants received unjust enrichment. (*Id.*)

On October 2, 2024, Plaintiff filed the FAC. (Doc. 19.) In addition to reasserting the original three counts, the FAC alleges a new Count One entitled "Petition To Compel Arbitration (Pursuant To 9 U.S.C. § 4)" ("Count One"). (*Id.* ¶¶ 53-56.) Among other things, Count One alleges that "[t]he Contract between and among Plaintiff and Defendants is valid and enforceable" and "contains an arbitration clause" and "Defendants have not agreed to arbitration pursuant to the arbitration clause but should be compelled to do so." (*Id.*)

On October 30, 2024, OEM filed a "Motion To Dismiss Count 1 Of The Amended Complaint And Response In Opposition To Plaintiff's Petition To Compel Arbitration." (Doc. 23 at 1.) That same day, Plasma-Therm filed a motion to dismiss "for lack of subject matter jurisdiction, lack of personal jurisdiction, and/or, alternatively, failure to state a claim." (Doc. 22 at 1.) These motions are now fully briefed. (Docs. 28, 30-31.)[2] Nobody requested oral argument.

…

---

[1]    Due to technical difficulties, the Court did not docket the complaint until July 8, 2024; however, Plaintiff moved to have the complaint construed as being filed on July 5, 2024 and the Court granted Plaintiff's motion. (Docs. 8, 11.)

[2]    Although Plaintiff characterizes its response to Defendants' motions as including a "Cross-Motion To Compel Arbitration" (Doc. 28), OEM disputes that characterization and argues that Plaintiff's amended complaint is itself a motion to compel arbitration under 9 U.S.C. § 6. (Doc. 30 at 2 n.1.) For that reason, OEM opposed Plaintiff filing a reply brief. (*Id.*) However, because Plaintiff did not attempt to file a reply brief or otherwise dispute OEM's characterization, the Court need not decide this issue. In either case, the motion is now fully briefed.

**ANALYSIS**

I.    <u>Plaintiff's Motion To Compel Arbitration And Defendants' Motions To Dismiss</u>
<u>Count One</u>

A.    **Legal Standard**

The FAA applies to contracts "evidencing a transaction involving commerce."  9 U.S.C. § 2.  Under the FAA, written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  *Id.*  Thus, absent a valid contractual defense, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

"The arbitrability of a particular dispute is a threshold issue to be decided by the courts."  *Nagrampa v. MailCoups*, 469 F.3d 1257, 1268 (9th Cir. 2006).  In general, a district court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). These two issues are sometimes referred to as the "gateway" questions of arbitrability. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).

The party seeking to compel arbitration bears the burden of proof.  *Ashbey v. Archstone Property Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).  "In determining whether parties have agreed to arbitrate a dispute, we apply general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration.  The presumption in favor of arbitration, however, does not apply if contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision."  *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044-45 (9th Cir. 2009).

…

…

B.    **Existence Of Arbitration Agreement**

1.    The Parties' Arguments

OEM argues it should not be compelled to arbitrate because "Plaintiff (bearing the burden) cannot prove the existence of binding arbitration agreement between the parties governing this dispute." (Doc. 23 at 8.) According to OEM, there is no such agreement because "Section 15 merely provides that disputes arising from the Contract 'shall be resolved through amicable negotiations,' and if negotiations fail, the dispute 'must then be *arbitrated or litigated* at a relevant arbitration institution or court in Shanghai.'" (*Id.* at 8, citing Doc. 23-2 at 6, emphasis added.) OEM argues this language does not show OEM obligated itself to submit to arbitration, and even though "Section 15 appears under the heading 'ARBITRATION,' the mere mention of the word 'arbitration' in a contract section's heading does not form a binding arbitration agreement." (*Id.*) In support, OEM cites *PaineWebber Inc. v. Chase Manhattan Private (Switzerland)*, 260 F.3d 453 (5th Cir. 2001), in which the Fifth Circuit found that a similarly worded contract did not create a binding arbitration agreement. (*Id.* at 8-9.) According to OEM, lower courts and courts in the Ninth Circuit have also found that there is no binding arbitration agreement when the language of the contract only requires arbitration as one of many options or where the options to arbitrate or litigate are placed on equal footing. (*Id.* at 9-10.)

Plasma-Therm also contends that, for various reasons, it cannot be compelled to arbitrate. (Doc. 22 at 2.)

In response, Plaintiff argues that "in the Ninth Circuit . . . provisions giving the option to elect arbitration or courts are mandatory when one party elects one of the two." (Doc. 28 at 2.) To that point, Plaintiff seeks to distinguish the district court decisions cited by OEM and argues that OEM's reliance on *PaineWebber* is misplaced. (*Id.* at 2, 9, 11 n.6.) According to Plaintiff, *PaineWebber* ultimately held that the parties' arbitration clause was not binding because it "left 'too many critical elements unaddressed'" but these same critical elements are either "not required in *this circuit*" or "*were* satisfied by the arbitration clause here." (*Id.* at 9.) Plaintiff further argues that "*PaineWebber's*

observation that requiring 'arbitration or litigation' is not 'language requiring arbitration' is also not the law in this and other circuits." (*Id.*)  According to Plaintiff, the law in the Ninth Circuit is that (1) contingent statements calling for arbitration among various options create binding arbitration agreements; (2) "the most minimal indication of the parties' intent to arbitrate must be given full effect, especially in international disputes"; (3) "[n]othing in the federal arbitration statute implies that the statue is inapplicable where arbitration is not the exclusive remedy"; and (4) a clause that gives either party "'the option' of going to court or arbitration" is enforceable "when one party invoke[s] that right." (*Id.* at 11-13.)  Plaintiff further argues that "if an option to 'litigate or arbitrate' is treated as []wholly optional, as defendants contend, it would serve no purpose . . . [because] [p]arties can always submit disputes to arbitration if they both agree to do so." (*Id.* at 14.) Moreover, Plaintiff argues that this "basic rule[] of contract interpretation"—that provisions of a contract should not be interpreted to have no effect—should "apply with even greater force here" because Section 15 specifically requires arbitration or litigation in Shanghai and "the parties agree that Shanghai Courts is not an option," so arbitration in Shanghai is the only remaining possibility.  (*Id.* at 15-16.)

In reply, OEM reiterates its position that "Section 15 does not amount to a binding arbitration agreement between the parties." (Doc. 30 at 2.)  OEM argues that Plaintiff's attempts to distinguish *PaineWebber* are unavailing because Plaintiff "misguidedly characterizes the factors considered by the *PaineWebber* court as required legal 'elements' for an arbitration agreement rather than the facts and contractual text relevant to the court's finding that the parties did not have an agreement to arbitrate." (*Id.* at 3.)  OEM further argues that the language of the contract in *PaineWebber* was "almost identical" to the contract here, and Plaintiff "fails to point to any Ninth Circuit Decision finding a binding arbitration agreement with similar arbitrate or litigate" language." (*Id.*)  Instead, according to OEM, the parties in the cases cited by Plaintiff "manifested a clear intention to arbitrate." (*Id.* at 4.)  OEM also seeks to distinguish the district court decisions cited by Plaintiff, arguing that in some of those cases, "[t]he court was not determining whether the parties

1   manifested an intent to be bound to arbitration, but instead confronted the issue of who

2   should decide arbitrability: the court or the arbitrator" (*id*. at 4 & n.2), and in other cases,

3   the court determined based on language elsewhere in the contract that "the parties only

4   wished to litigate as a last resort." (*Id.* at 5.)  Last, OEM argues that "[w]hile Section 15

5   suggests a preference as to the venue of any disputes (*i.e.*, Shanghai, China), it does not

6   express a clear intent to arbitrate disputes between the parties" and Plaintiff "waived any

7   argument of exclusive venue in Shanghai by choosing to file suit in Arizona." (*Id.* at 6 &

8   n.4.)

9          Likewise, Plasma-Therm reiterates in its reply that it cannot, for various reasons, be

10  compelled to arbitrate.  (Doc. 31 at 5-10.)

11                      2.    <u>Analysis</u>

12         The parties' dispute over arbitrability implicates the first gateway question, which

13  is "whether a valid agreement to arbitrate exists." *Chiron Corp.*, 207 F.3d at 1130.  OEM

14  does not contend that Plaintiff's claims in this action fall outside the scope of an otherwise

15  valid arbitration agreement—instead, OEM contends that it never entered into a binding

16  contractual agreement with Plaintiff to arbitrate any sort of dispute.  Thus, OEM "contests

17  the existence, not the scope, of an arbitration agreement that would encompass this

18  dispute." *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023).  And when, as here,

19  "the parties contest the existence of an arbitration agreement, the presumption in favor of

20  arbitrability does not apply." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742

21  (9th Cir. 2014).  Instead, when "the existence of an arbitration agreement is at issue . . . we

22  use general state-law principles of contract interpretation to decide whether a contractual

23  obligation to arbitrate exists." *Johnson*, 57 F.4th at 681

24         The parties agree[3] that the Court must look to Arizona law when interpreting the

25  _____

26  [3]    Doc. 23 at 7 ("Here, Arizona law governs."); Doc. 28 at 12, 15 (citing Arizona
    cases.  *See generally Norcia v. Samsung Telecomms. Am, LLC*, 845 F.3d 1279, 1283-84
27  (9th Cir. 2017) ("Here, the parties agree that California law governs the issue of contract
    formation."); *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (discussing
28  the principle of party presentation).

                                    - 9 -

parties' agreement and determining whether it evinces the existence of an obligation to arbitrate. *Baten v. Michigan Logistics, Inc.*, 830 F. App'x 808, 810 (9th Cir. 2020) ("This circuit looks to state law to determine whether an agreement constitutes an agreement to arbitrate."). Under Arizona law, "[t]he purpose of contract interpretation is to determine the parties' intent and enforce that intent. In order to determine what the parties intended, we first consider the plain meaning of the words in the context of the contract as a whole. Where the intent of the parties is expressed in clear and unambiguous language, there is no need or room for construction or interpretation and a court may not resort thereto." *Grosvenor Holdings, L.C. v. Figueroa*, 218 P.3d 1045, 1050 (Ariz. Ct. App. 2009) (citations omitted). "It is not within the province or power of the court to alter, revise, modify, extend, rewrite or remake an agreement. Its duty is confined to the construction or interpretation of the one which the parties have made for themselves. Where the intent of the parties is expressed in clear and unambiguous language, there is no need or room for construction or interpretation and a court may not resort thereto." *Shattuck v. Precision-Toyota, Inc.*, 566 P.2d 1332, 1334 (Ariz. 1977). "Language in a contract is ambiguous only when it can reasonably be construed to have more than one meaning." *In re Est. of Lamparella*, 109 P.3d 959, 963 (Ariz. Ct. App. 2005).

The Court's task in analyzing the Contract is complicated by the existence of three different versions—a Chinese version and two competing English versions. As discussed in the Background section of this order, the original Contract contained side-by-side English and Chinese text. At first glance, the side-by-side English version ("Version 1") appears to indicate that the parties intended to engage in some form of arbitration, although the details were left undetermined. (Doc. 19 at 19 ["In case no settlement can be reached through negotiations, the case shall then be submitted for arbitration in Shanghai."].) Version 1, however, also contains multiple errors. For example, it states that "the case shall . . . be submitted for arbitration to the Shanghai" but also that "[t]he arbitration shall take place in Beijing"; and it never indicates the appropriate arbitration commission even though the text states that "the decision rendered by the said *Commission* shall be final."

(*Id.*, emphasis added). Version 1 stands in sharp contrast to a second English version submitted by OEM as an attachment to its motion to dismiss ("Version 2"). Version 2 is an English translation of the Contract's Chinese text, conducted by the company Translate.One and accompanied by a certificate of authenticity. (Doc. 23-2 at 2-6.) Unlike Version 1, Version 2 is free from internal contradictions and English usage errors. Version 2 is also less clear about the parties' intent to arbitrate. Specifically, it provides that "[s]hould negotiations fail, disputes must then be arbitrated *or* litigated at a relevant arbitration institution *or* court in Shanghai." (*Id.* at 6, emphases added.) This "arbitrated *or* litigated" language is at the heart of the parties' disagreement.

For the limited purpose of determining whether an arbitration agreement exists, the Court concludes that Version 2 is controlling. The Court reaches this conclusion for three reasons. First, it appears self-evident that, based on its numerous inaccuracies and inconsistencies, Version 1 is not an accurate translation of the Contract's Chinese text. *Cf. Perez-Lastor v. I.N.S.*, 208 F.3d 773, 778 (9th Cir. 2000) (in the context of a due-process violation, "direct evidence of incorrectly translated words is persuasive evidence of an incompetent translation"). This is significant because Version 1 and Version 2 both unambiguously state that the Chinese language version of the Contract is controlling in the event of a discrepancy. (Doc. 19 at 19 ["Should any difference occurred between the English and Chinese Languages used in the contract, the Chinese copy shall be taken as the principal."]; Doc. 23-2 at 6 ["This contract is written in both Chinese and English. In the event of any discrepancy, the Chinese version shall prevail."].) If Version 2 is an accurate translation, then it controls over Version 1 (which, in addition to containing numerous errors, does not itself purport to be an accurate translation of the Chinese text). Second, and relatedly, Plaintiff does not dispute the accuracy of Version 2 or otherwise attempt to impeach OEM's translation. Instead, Plaintiff relies on both Version 1 and Version 2 in support of its arguments. (*See, e.g.*, Doc. 28 at 10 ["OEM's translation of Section 15 mandates 'a relevant arbitration institution … in Shanghai.' The 'relevant' institutional candidates are identified by the original English version."].) Third, Plaintiff

bears the burden of showing that an agreement to arbitrate exists. "In considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate was made, a district court should give to the opposing party the benefit of all reasonable doubts and inferences that may arise. Only when there is no genuine issue of material fact concerning the formation of an arbitration agreement should a court decide as a matter of law that the parties did or did not enter into such an agreement." *Bryant v. JPMorgan Chase Bank, N.A.*, 2025 WL 313204, *2 (C.D. Cal. 2025) (cleaned up). *See also Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991) ("Only when there is no genuine issue of material fact concerning the formation of the [arbitration] agreement should a court decide as a matter of law that the parties did or did not enter into such an agreement.") (citation omitted). For these reasons, Version 2 presents the more accurate translation of the controlling Chinse text, at least for the narrow purpose of resolving Plaintiff's request to compel arbitration.[4]

Turning to the text of Version 2, Plaintiff has failed to show that the parties entered into a valid arbitration agreement. Based on the plain text of Version 2, there was no agreement to "arbitrate," but only an agreement to "arbitrate[] or litigate[]" in Shanghai. That is not enough.

Although neither party cites binding authority to support its proffered interpretation, the persuasive authority supports OEM's position. In *PaineWebber*, the Fifth Circuit concluded that an almost identically worded contract did not create a binding arbitration agreement. 260 F.3d at 462-63. There, the contract stated that "any dispute between [Chase–Switzerland] and PaineWebber which cannot be resolved by good faith negotiations shall be submitted to the appropriate arbitrator or court in the United States." *Id.* at 462. The Fifth Circuit concluded that the contract "identifies 'court' and 'arbitration' as equals" and "merely provides that the parties will attempt to negotiate any disputes in

---

[4]    Regarding the merits of Plaintiff's claims apart from the request to compel arbitration, OEM acknowledges that "it is unclear at this stage in the litigation which version of the Contract . . . controls." (Doc. 23 at 1 n.1.)

good faith and, absent a resolution, shall conduct dispute resolution proceedings *in the United States*." *Id.* at 462-63 (emphasis in original). The court further noted that "the language of the agreement itself conspicuously lacks any of the universal indicia of an arbitration clause" such as a specific arbitral forum, geographic location, or the arbitral rules that should govern the parties' dispute. *Id.* at 643 & n.22.

Version 2 mirrors the contractual language at issue in *PaineWebber*. Here, as there, the parties have agreed to nothing more than "arbitration or litigation" in a specific location. And like the contractual language in *PaineWebber*, Version 2 places arbitration and litigation on equal footing and lacks many of the "universal indicia of an arbitration clause" that other courts have identified. Although, as Plaintiff notes, "Shanghai" is a more definite geographic location than the geographic location identified in *PaineWebber* ("the United States"), there is still no mention of the specific arbitral forum or the arbitral rules that should govern the parties' dispute.[5] In Arizona, such omissions are noteworthy and support a conclusion that no arbitration agreement exists. *Longnecker v. Am. Exp. Co.*, 23 F. Supp. 3d 1099, 1106 (D. Ariz. 2014) ("For an enforceable contract to exist, there must be . . . sufficient specification of terms so that the obligations involved can be ascertained.") (citation omitted).[6]

OEM's proposed interpretation of Version 2 is also supported by persuasive authority from within the Ninth Circuit. In *Bonner v. Michigan Logistics Inc.*, 250 F. Supp. 3d 388, (D. Ariz. 2017), the district court determined that an agreement "to resolve any disputes . . .directly or with an agreed form of Alternative Dispute Resolution" did not

---

[5]     Although Plaintiff argues that "[t]he arbitration agreement also does indicate the intended institutions" (Doc. 28 at 17), this argument is based on an inference drawn from Version 1.

[6]     The Court recognizes that Arizona courts have sometimes enforced arbitration agreements that fail to specify the appropriate arbitral forum or the appropriate rules of arbitration. In Arizona, however, arbitration agreements that arise under A.R.S. § 12-1501 *et seq.* (the Arizona arbitration statute) are subject to gap-filling provisions outlined in that statute. *Est. of Decamacho ex rel. Guthrie v. La Solana Care & Rehab, Inc.*, 316 P.3d 607, 611 (Ariz. Ct. App. 2014) ("[E]ven when an arbitration agreement does not specify the procedures and terms relating to arbitration, the statutes clearly do.").

create a binding arbitration agreement. *Id.* at 393, 396. Applying Arizona law, the court concluded that although the parties had agreed "to resolve disagreements through ADR rather than litigation," there was "no basis for the Court to compel arbitration specifically" because "th[e] ADR provision did not specify the form of ADR to which the parties agreed [and] Arbitration is just one of several mechanisms of alternative dispute resolution." *Id.* at 396 (cleaned up). If courts applying Arizona law are unwilling to find an enforceable agreement to arbitrate when the contract fails to specify which method of ADR to utilize, it follows that the Court should be similarly reluctant (and perhaps even more so) to find an enforceable agreement to arbitrate where the contract contemplates both arbitration and more conventional dispute resolution (*i.e.*, litigation). *See also Baten*, 830 F. App'x at 810 (applying California law to a similar contract as in *Bonner* and reaching the same conclusion).

To support a contrary reading, Plaintiff cites several cases in which courts found that "permissive" language in an arbitration agreement created a mandatory obligation to arbitrate at the option of either party. (Doc. 28 at 13.) The Court is respectfully unpersuaded that the agreements at issue in Plaintiff's cited cases are analogous to the precise contractual language at issue here. The majority of those cases involved language such as: "If the parties hereto cannot resolve the dispute after sixty (60) days from the commencement of mediation, then either party *may submit* the Dispute to arbitration." *Quantum Fluids LLC v. Kleen Concepts LLC*, 2021 WL 242104, *1 (D. Ariz. 2021) (emphasis added). Courts both within and outside the Ninth Circuit have concluded that such "may . . . arbitrate" language does, in fact, create a mandatory obligation at the option of either party. *See*, *e.g.*, *Deaton Truck Line, Inc. v. Local Union 612*, 314 F.2d 418, 421 (5th Cir. 1962). But such language is distinct from the "arbitrate or litigate" language at issue here. Unlike "arbitrate or litigate" language, which provides a binary option between two equally situated alternatives, the "may . . . arbitrate" language puts forward arbitration as the sole alternative to failed mediation or negotiation. For this reason, "[t]he obvious purpose of the 'may' language is to give an aggrieved party the choice between arbitration

or the abandonment of its claim." *Bonnot v. Cong. of Indep. Unions, Loc. No. 14*, 331 F.2d 355, 359 (8th Cir. 1964). Here, in contrast, there is no such implication because litigation is offered as an explicit alternative. *Cf. Realty Execs. Int'l Servs. LLC v. Devonshire W. Can. Ltd.*, 2019 WL 4259767, *1-2 (D. Ariz. 2019) (concluding that contractual language stating that "'either party *may* submit' to arbitration" created a mandatory obligation to arbitrate in part because, unlike here, "[t]he agreement expressly state[d] that [informal discussion, mediation, and binding arbitration] are the 'sole and exclusive procedures for the resolution of disputes between the parties arising out of or relating to this Agreement'").

Nor is there any merit to Plaintiff's argument that "[t]here would be no reason for the arbitration language . . . if the parties intended it to be permissive." (Doc. 28 at 13, citation omitted.) To be sure, some courts have concluded that interpreting the phrase "may . . . arbitrate" as permissive would create surplusage because "the parties could voluntarily have agreed to submit a dispute to arbitration" even in the absence of such a provision. *Am. Italian Pasta Co. v. The Austin Co.*, 914 F.2d 1103, 1104 (8th Cir. 1990). *See also New Orleans & N. E. R. Co. v. Bozeman*, 312 F.2d 264, 268 (5th Cir. 1963) ("It would be meaningless for the order to provide that the appellees may refer the dispute to arbitration if such provision were to be construed as also meaning that such election could be defeated by the refusal of the appellant to acquiesce."). In this case, however, the parties have also agreed that "disputes must . . . be arbitrated or litigated . . . *in Shanghai*." (Doc. 23-2 at 6, emphasis added.) This additional specification—that arbitration or litigation must occur in Shanghai—eliminates any risk that the phrase "arbitrate[] or litigate[]" would be rendered a nullity by OEM's proposed interpretation. True, the parties could still have chosen to "arbitrate[] or litigate[]" their disputes in the absence of such a clause, but the additional phrase "in Shanghai" places other meaningful limits on the parties' choice and thus avoids the surplusage issue. *See also PaineWebber*, 260 F.3d at 462-63 (clause requiring that disputes "'shall be submitted to the appropriate arbitrator or court in the United States' . . . merely provides that the parties will attempt to negotiate any disputes in good faith and, absent a resolution, shall conduct dispute resolution proceedings *in the*

1    *United States*.") (emphasis in original).[7]

2        The other so-called "permissive" arbitration cases cited by Plaintiff are equally

3   unavailing.  Those cases either (1) deal with separate issues of law distinct from the

4   existence of an arbitration agreement (such as whether the issue of arbitrability should itself

5   be arbitrated); (2) apply state law that is inapplicable here; or (3) contain explicit language

6   creating a clear "option" for either party to enforce arbitration unilaterally.  *See, e.g.*, *JDA*

7   *Software, Inc. v. Sabert Holding Corp.*, 2017 WL 1398561 (D. Ariz. 2017) (determining

8   whether the question of arbitrability is subject to arbitration); *Howard Fields & Assocs. v.*

9   *Grand Wailea Co.*, 848 F. Supp. 890, 896 (D. Haw. 1993) ("[A] party to a non-exclusive

10  dispute resolution/arbitration clause may have a right to initiate a lawsuit, but if another

11  party wishes to arbitrate, *the Hawaii Supreme Court* made it clear that arbitration should

12  be ordered.") (emphasis added); *Excavating & Grading, Inc. v. Hinkle Contracting Co.,*

13  *LLC*, 2011 WL 5999868, *5 (S.D.W. Va. 2011) (contractual language provided that

14  disputes "shall be resolved by mediation followed by arbitration or litigation at [one

15  party's] *sole option*") (emphasis added).

16        Finally, because there is no valid arbitration agreement between Plaintiff and OEM,

17  Plaintiff cannot compel arbitration as to Plasma-Therm pursuant to that agreement.[8]

18        …

19        …

20        …

21        …

22

23  [7]     Plaintiff also argues that arbitration is the only option in this case because "[t]here

24  is also no question that neither OEM nor [Plaintiff] wants go to court in Shanghai" and "as

25  a matter of logic, when a person must choose between two options and decides to forego

26  one of them, then the second option necessarily becomes mandatory."  (Doc. 28 at 15-16,

27  citation omitted.)  Plaintiff, however, has not cited any evidence that shows litigation in

    Shanghai is impossible.  Nor, as Plaintiff claims, do "each side's submissions make clear"

    that the parties do not want to litigate in Shanghai.  (*Id.* at 15.)

28  [8]     This conclusion makes it unnecessary to resolve Plasma-Therm's alternative

    argument that Plaintiff waived its right to arbitration.

1    II.    Plasma-Therm's Motion To Dismiss For Lack Of Jurisdiction

2           A.    **Legal Standard**

3                  1.    Personal Jurisdiction

4           A defendant may move to dismiss for lack of personal jurisdiction.  Fed. R. Civ. P.

5    12(b)(2).  "In opposing a defendant's motion to dismiss for lack of personal jurisdiction,

6    the plaintiff bears the burden of establishing that jurisdiction is proper."  *Ranza v. Nike*,

7    *Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (citation omitted).  "Where, as here, the

8    defendant's motion is based on written materials rather than an evidentiary hearing, the

9    plaintiff need only make a *prima facie* showing of jurisdictional facts to withstand the

10   motion to dismiss."  *Id.* (citations and internal quotation marks omitted).

11          "Federal courts ordinarily follow state law in determining the bounds of their

12   jurisdiction over persons."  *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017)

13   (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)).  "Arizona law permits the

14   exercise of personal jurisdiction to the extent permitted under the United States

15   Constitution."  *Id.* (citing Ariz. R. Civ. P. 4.2(a)).  Accordingly, whether this Court has

16   personal jurisdiction over Plasma-Therm "is subject to the terms of the Due Process Clause

17   of the Fourteenth Amendment."  *Id.*

18          "Constitutional due process requires that defendants 'have certain minimum

19   contacts' with a forum state 'such that the maintenance of the suit does not offend

20   'traditional notions of fair play and substantial justice.'"  *Id.* (quoting *Int'l Shoe Co. v.

21   Washington*, 326 U.S. 310, 316 (1945)).  Minimum contacts exist "if the defendant has

22   continuous and systematic general business contacts with a forum state (general

23   jurisdiction), or if the defendant has sufficient contacts arising from or related to specific

24   transactions or activities in the forum state (specific jurisdiction)."  *Id.* at 1142 (internal

25   quotation marks omitted).

26                  2.    Subject-Matter Jurisdiction

27          Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a defendant may

28   move to dismiss an action for "lack of subject-matter jurisdiction."  "Under Rule 12(b)(1),

a defendant may challenge the plaintiff's jurisdictional allegations in one of two ways.  A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction. . . .  A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings."  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation omitted).  Either way, the plaintiff bears the burden of establishing that subject-matter jurisdiction exists.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).[9]

## B.    **Jurisdictional Facts**

When ruling on a motion to dismiss for lack of personal jurisdiction, "uncontroverted allegations must be taken as true, and [c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor," but "[a] plaintiff may not simply rest on the bare allegations of [the] complaint."  *Ranza*, 793 F.3d at 1068 (citations and internal quotation marks omitted).  The Court may also consider "deposition testimony and other evidence" outside of the pleadings to determine whether it has personal jurisdiction.  *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 268 (9th Cir. 1995); *Lee v. Plex, Inc.*, 2025 WL 948118, *7 (N.D. Cal. 2025) ("The court may also consider 'declarations and other evidence outside the pleadings.'").  *See also* 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 12 (2024) ("The plaintiff must supply specific facts in support of personal jurisdiction.").[10]

Here, Plasma-Therm provided a declaration from Russell Westerman ("Westerman"), its Executive Vice President of Technology, in support of its motion to dismiss.  (Doc. 22-1.)  In response, Plaintiff provided a declaration from Plaintiff's counsel

---

[9]    Courts also "have an independent obligation to determine whether subject-matter jurisdiction exists."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  *See also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[10]    Contrary to Plasma-Therm's argument that "Plaintiff's efforts to demonstrate personal jurisdiction far exceed the allegations of the Complaint, and are therefore beyond the Court's inquiry" (Doc. 31 at 4), the Court is not limited to examining the allegations contained in the FAC for the reasons stated above.

(Doc. 29), an excerpt of the asset purchase agreement between Plasma-Therm and OEM (Doc. 29-6), a copy of emails exchanged between Plaintiff, Plasma-Therm, and OEM, as well as between their respective counsel (Docs. 29-1-5, 29-7-9), and various documents concerning the physical location of two of Plasma-Therm's employees (Docs. 29-10-13). Accordingly, the summary of jurisdictional facts below is based on the allegations in the FAC (where uncontroverted by Plasma-Therm), the assertions in Plasma-Therm's declaration (where uncontroverted by Plaintiffs' evidence), and Plaintiffs' evidence.

### 1.    Plasma-Therm's Business

"In 2008, [Plasma-Therm] was formed in Florida as a manager-managed Florida limited liability company ('LLC'). Initial ownership interest in Plasma-Therm was equally divided among the four original managers: Abdul Lateef, James Pollock, Edward Ostan, and [Westerman]." (Doc. 22-1 ¶ 3.) "The original Operating Agreement of Plasma-Therm was . . . drafted, negotiated, and signed in Florida by the four managers, all of whom were residents of Florida." (*Id.* ¶ 4.)

In 2011, "[t]he Operating Agreement was amended . . . with the amendment also executed and concluded in Florida." (*Id.*) That same year, "RAJE Technology Group, LLC ('RAJE') was formed in Florida as a manager-managed Florida LLC. The entire ownership interest in Plasma-Therm was subsequently transferred to RAJE." (*Id.* ¶ 5.) Plasma-Therm, however, continued to be managed by the same four original managers, who are also responsible for the management of RAJE. (*Id.* ¶ 6.) Plasma-Therm's current operating agreement provides "that Florida law governs; that the principal office and mailing address of Plasma-Therm was, and continues to be, located at 10050 16th Street North, St. Petersburg, Pinellas County, Florida 33716; and that a registered office and agent be appointed in Florida." (*Id.* ¶ 7.) This "managerial and operational framework remains in place to this day" and all of Plasma-Therm's managers continue to be domiciled in Florida. (*Id.* ¶¶ 6, 8.)

Plasma-Therm also carries out the majority of its business operations in Florida. For instance, "the general day-to-day direction, supervision, and control of Plasma-

Therm's technology" as well as the majority of its "[r]eseach and development," "equipment manufacturing," "customer support and service," "process engineering support," "supply chain and component sourcing," and "sales and marketing" take place at its headquarters in Florida or are conducted by Florida personnel.  (*Id.* ¶¶ 11, 15.)  Plasma-Therm's Florida headquarters "is located at: 10050 16th Street North, St. Petersburg, Florida 33716."  (*Id.* ¶ 16.)

"In addition to being registered to conduct business in Florida, its principal location, Plasma-Therm is . . . also registered to do business in the following states: New Mexico, New York, California, New Jersey, and Texas."  (*Id.* ¶ 18.)  Plasma-Therm also maintains "a single office in Arizona . . . .  This small Arizona office has six employees who primarily handle and maintain engineering documentation and product support for a subset of product lines acquired from [OEM].  (*Id.* ¶ 22.)  At least some of the employees at the Arizona location were also employed by OEM before Plasma-Therm purchased portions of OEM's business.  (Doc. 29-7-13.)  "Plasma-Therm leases its Arizona office space, which does have a mailing address.  Beyond this, Plasma Therm does not maintain a registered agent, own real property, hold accounts with Arizona financial institutions, hold meetings, send official communications, or conduct any managerial activities from or within the State of Arizona."  (Doc. 22-1 ¶ 23.)  "Only a small portion of Plasma-Therm's sales or revenue is generated from contacts or business activities in Arizona."  (*Id.* ¶ 24.)

## 2.    Plasma-Therm's Contract With OEM

"On December 2, 2020, OEM and Plasma-Therm entered into an Asset Purchase Agreement ('APA'), under which Plasma-Therm acquired specific assets of OEM, excluding certain liabilities and business assets."  (*Id.* ¶ 41.)  Under that agreement, Plasma-Therm agreed to purchase from OEM, among other things, "the Contracts set forth on Schedule 2.1(c) (the 'Assigned Contracts')"; "all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories of the Business"; "all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property located at Seller's offices in

Phoenix, AZ (collectively, the 'Tangible Personal Property')"; and a portion of OEM's intellectual property. (Doc. 29-6 at 2-3 [Sections 2.1(b), (c), (d), (e)].) Plasma-Therm also agreed to assume certain liabilities including, among other things, "all Liabilities in respect of the Assigned Contracts but only to the extent that such Liabilities thereunder are required to be performed or arise after the Closing Date, were incurred in the ordinary course of business"; "the current backlog related open customer purchaser orders incurred in the ordinary course of business as set forth on Schedule 2.3 (the 'Customer Backlog')"; "all Liabilities to customers for products or services of the Business that have not yet been delivered or rendered as of the Closing with respect to the backlog set forth on Schedule 2.3"; and "all Liabilities for warranty claims relating to or arising out of the manufacturing, marketing, sale, or distribution of the products and services of the Business, whether before or after the Closing, and whether arising under warranty, contracts, equity, tort, strict liability, product liability, statute or otherwise." (*Id.* at 4-5 [Sections 2.3(b), (c), (e), (f)].) In addition, the APA provides that Plasma-Therm "shall not assume and shall not be responsible to pay, perform or discharge any Liabilities related to [OEM] or to any Excluded Business, or any of its shareholders' Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the 'Excluded Liabilities')." (*Id.* at 5 [Section 2.4].) These Excluded Liabilities include "any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets" and "any Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that . . . are not validly and effectively assigned to [Plasma-Therm] pursuant to this Agreement." (*Id.* at 6 [Sections 2.4(d), (h)].)

The list of Assigned Contracts at Schedule 2.1(c) includes "Purchase orders by and between OEM Group, LLC and third parties entered into in the ordinary course of the Business set forth in Schedule 2.3 below." (*Id.* at 14.) In turn, Schedule 2.3 of the APA—titled "Assumed Liabilities"—references a series of spreadsheet documents including "Exhibit 2.3(b)(i)—Current Backlog Related to Customer Purchase Orders (System and

Parts)" and "Exhibit 2.3(b)(ii)—Current Backlog Related to Customer Purchase Orders (Services)." (*Id.* at 15.) Exhibit 2.3(b)(1) includes the following entry:

| Order Type | Bill To Name | Sales Order Number | Sum of Remaining SO Revenue | Sum of Orig Value |
|---|---|---|---|---|
| PROJECT | .... | .... | .... | .... |
| | Jiang CorEnergy Semiconductor | 194849A | 63,000 | 630,000 |

(*Id.* at 42.)

The APA also contains two provisions on indemnification, providing that OEM will indemnify Plasma-Therm for any losses "arising out, resulting from or incurred in connection with . . . any breach or non-fulfillment of any covenant, agreement, or obligation of Seller contained in this Agreement" as well as any losses incurred in connection with "any Excluded Liability." (*Id.* at 8 [Sections 6.2(b), (c)].) In turn, Plasma-Therm agreed to indemnify OEM against "any Losses incurred . . . after the Closing to the extent arising out of or resulting from: . . . any breach or non-fulfillment of any covenant, agreement or obligation of Purchaser or its Affiliates contained in this Agreement; or . . . any Assumed Liability." (*Id.* at 8-9 [Sections 6.3(b), (c)].) As part of the indemnification provision, the parties also agreed that the party claiming a right to indemnity should notify the other party and "[i]f the Indemnifying Party denies liability in whole or in part or advises that the matters set forth in the notice are, or will be, subject to contest or legal proceedings not yet finally resolved, then the Indemnifying Party shall assume and thereafter conduct the defense of the Third-Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party." (*Id.* at 11 [Section 6.5].)

Apart from the APA and the agreements described above, "Plasma-Therm is not involved in or affiliated with the business operations of OEM. It is not a parent company . . . [and] holds no ownership interest or shares in OEM, is not in any agency relationship with OEM, and is not authorized to act on its behalf in any capacity." (Doc. 22-1 ¶ 38.)

C. **Personal Jurisdiction**

1. <u>The Parties' Arguments</u>

Plasma-Therm argues it is not subject to general or specific personal jurisdiction in

Arizona. (Doc. 22 at 4-7.) Regarding general jurisdiction, Plasma-Therm argues that its principal place of business is in Florida because "[t]he Complaint concedes that Plasma-Therm is a Florida LLC" and, according to reports filed with the Florida Secretary of State, "it maintains a registered agent and directs, controls, and coordinates its activities" all in Florida. (*Id.* at 6.) Plasma-Therm also argues that the FAC only contains a "threadbare and formulaic recitation of minimum contacts" and an allegation that Plasma-Therm's website lists an office in Arizona. (*Id.*) According to Plasma-Therm, this is insufficient because "to invoke general jurisdiction, Plaintiff needed . . . to provide an 'appraisal of [Plasma-Therm's] activities in their entirety,' including its connections with Arizona compared to its activities in other states and throughout the world." (*Id.*, citation omitted.) In addition, Plasma-Therm argues that its "acquisition of OEM's asset did not itself confer general jurisdiction." (*Id.* at 7.) Regarding specific jurisdiction, Plasma-Therm argues that Plaintiff failed to establish purposeful availment because the FAC's allegations fail to make "any specific reference to Plasma-Therm's own connections to Arizona, aside from its ties to OEM" and those ties are insufficient. (*Id.* at 7.) For example, Plasma-Therm argues that even though "Plasma-Therm and OEM 'jointly issued' a letter . . . which addressed Plasma-Therm's acquisition of the 'Eclipse product line,'" that letter was on OEM's letterhead and "relate[d] to nationwide contacts, not activities specifically directed to Arizona." (*Id.* at 7-8.) Further, Plasma-Therm argues that even if it assumed the Contract, its involvement with that deal was "a single transaction—a 'one-shot affair'" and "it is undisputed that Plasma-Therm had no involvement whatsoever in the Contract negotiations or course of dealing between Plaintiff and OEM." (*Id.* at 8.) Last, Plasma-Therm argues that Plaintiff has failed to establish that its claims "stem from Plasma-Therm's Arizona activities" because "[t]he alleged assumption of the Contract bears no relation to the claims alleged" and the FAC fails to "identify [Plasma-Therm's Arizona] office's direct and continuous involvement in the events raised in the Complaint." (*Id.* at 9.)

In response, Plaintiff argues that the Court possesses personal jurisdiction over Plasma-Therm because Plasma-Therm expressly assumed the Contract, including OEM's

warranty, and "[i]t is well settled . . . that express assumption of a forum defendant's contract makes an out-of-state defendant a successor and imputes the predecessor's jurisdictional contacts to it."  (Doc. 28 at 2.)  Further, Plaintiff appears to argue that the distinction between specific and general jurisdiction is immaterial because "due to express assumption . . . the Court's possession of general jurisdiction over OEM is imputed to Plasma-Therm, so it can exercise general or specific jurisdiction."  (*Id.* at 25 n.9.) According to Plaintiff, the fact that Plasma-Therm assumed the Contract is evidenced by "select portions of [OEM's] agreement with Plasma-Therm" that were produced by OEM after Plasma-Therm filed its initial motion to dismiss.  (*Id.* at 1.)  Plaintiff argues that, in these portions of the APA, OEM designated the Contract as an "assigned contract" and listed it among Plasma-Therm's "assumed liabilities" "agreeing to honor OEM's existing warranties" and agreeing "to indemnify OEM for claims arising from these assumed liabilities."  (*Id.* at 24-25.)  Plaintiff also argues that, despite Plasma-Therm's attempts to downplay its contacts with Arizona, the APA "is itself a jurisdictionally relevant contact with Arizona"; that "specific jurisdiction does not require more than a single office"; that Plasma-Therm continues to maintain OEM's Arizona facilities and employ people who worked for OEM; and that Plasma-Therm's product support for products formerly produced by OEM remains in Arizona.  (*Id.* at 25.)  According to Plaintiff, these contacts, along with the Contract, are enough to satisfy the "purposeful availment" and minimum contacts requirements for personal jurisdiction under an "express assumption or 'de-facto' consolidation" theory of successor liability.  (*Id.* at 27.)  Plaintiff also argues that Plasma-Therm cannot show that the assertion of jurisdiction would be unreasonable because Plasma-Therm "bought the Arizona facilities that would have been used to fulfill [Plaintiff's] contract and currently maintains offices and employees in Arizona to carry on the inherited OEM operations in Arizona."  (*Id.* at 28-29.)  Last, Plaintiff argues that the cases cited to support Plasma-Therm's position are factually distinguishable because "all three . . . involved discrete, one-off transactions with out-of-state defendants," as opposed to the express assumption of a forum-defendant's obligations and other "forum-based

'ongoing obligation[s].'" (*Id.* at 29.) Plasma-Therm also argues that "Jurisdictional Discovery Would Be Warranted If The Court Inquires Beyond Express Assumption In The APA." (*Id.* at 30.)

In reply, Plasma-Therm argues that "by its clear and unambiguous terms, the APA excludes the Contract, including the related Sales Order, from the liabilities assumed by Plasma-Therm." (Doc. 31 at 2.) According to Plasma-Therm, "the APA explicitly states that only specifically identified liabilities were assumed by Plasma-Therm" and "the Contract at issue is not listed among those 'Assigned Contracts' identified in Schedule 2.1(c)." (*Id.*) Further, Plasma-Therm argues that "[a]lthough the APA acknowledges that Plasma-Therm assumed certain liabilities related to the backlog of open customer purchase orders listed in Schedule 2.3, it does **not** explicitly provide for the assumption of all terms and obligations of those respective customer contracts." (*Id.* at 2-3.) Further, Plasma-Therm argues that even though "[e]xhibit 2.3(b)(i) lists Plaintiff in the 'Current Backlog Related to Customer Purchase Orders (System and Parts)' . . . a critical discrepancy exists: the Sales Order Number (194849A) listed in Exhibit 2.3(b)(i) does not match the Contract's Sales Order Number, demonstrating that performance of the Contract was not included among the assumed liabilities." (*Id.* at 3.) This is particularly significant, according to Plasma-Therm, because the APA limits Plasma-Therm's liability for unfulfilled commitments and purchase orders that are not "validly and effectively assigned" to Plasma-Therm and for "any Third Party Claim based upon, resulting from or arising out of [OEM's] operation of the Business prior to the Closing Date [December 2, 2020]." (*Id.*) For these reasons, Plasma-Therm argues that "general personal jurisdiction does not arise by virtue of the APA." (*Id.* at 4.) Plasma-Therm also argues that "Plaintiff's assertion that Plasma-Therm's acquisition of OEM's asset constitutes purposeful availment lacks legal foundation . . . [because] the evaluation of purposeful availment hinges on Plasma-Therm's contacts with the forum, excluding those with or by virtue of OEM." (*Id.* at 5.) Last, Plasma-Therm argues that jurisdictional discovery is improper because "the Complaint is defective under the relevant pleading standards." (*Id.* at 5.)

1          2.    Analysis

2          As a preliminary matter, the Court declines to consider personal jurisdiction under

3    the so-called "successor jurisdiction theory."  Applying that theory, some district courts in

4    the Ninth Circuit have found that "personal jurisdiction over a successor company exists

5    where (i) the court would have had personal jurisdiction over the predecessor and (ii) the

6    successor company effectively assumed the subject liabilities of the predecessor." *City &*

7    *Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 644 (N.D. Cal. 2020).

8    *See also Successor Agency to Former Emeryville Redevelopment Agency v. Swagelok Co.*,

9    364 F. Supp. 3d 1061, 1073-76 (N.D. Cal. 2019) (*citing Lefkowitz v. Scytl USA*, 2016 WL

10   537952 (N.D. Cal. 2016)).    This rule has also been followed in other jurisdictions.

11   *Perceptron, Inc. v. Silicon Video, Inc.*, 423 F. Supp. 2d 722, 725 (E.D. Mich. 2006).  In the

12   Ninth Circuit, however, this rule has not been formally adopted, and district courts applying

13   this rule appear to base their decisions, at least in part, on state law that is inapplicable here.

14   *Lefkowitz*, 2016 WL 537952 at *3 (applying California law); *Perceptron, Inc.*, 423 F. Supp.

15   2d at 725 (applying Michigan law).  For this reason, and because Plaintiff has met its

16   burden of establishing personal jurisdiction over Plasma-Therm under the traditional test

17   for specific personal jurisdictional, the Court begins there.

18         To determine whether Plasma-Therm has sufficient contacts with Arizona to be

19   subject to specific jurisdiction in Arizona, the Court must apply the Ninth Circuit's three-

20   prong test:

> (1) The non-resident defendant must purposefully direct his activities or
> consummate some transaction with the forum or resident thereof; or perform
> some act by which he purposefully avails himself of the privilege of
> conducting activities in the forum, thereby invoking the benefits and
> protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's
> forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial
> justice, i.e., it must be reasonable.

*Morrill*, 873 F.3d at 1142.  "The plaintiff bears the burden of satisfying the first two prongs

of the test." *Id.* (internal quotation marks omitted). "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.* "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.*

Courts "generally apply the purposeful availment test when the underlying claims arise from a contract, and the purposeful direction test when they arise from alleged tortious conduct. *Id.* Here, Plaintiff's claims arise from contract, so the purposeful availment test applies.

### a.    **Purposeful Availment**

"To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008) (citation and internal quotation marks omitted). The conduct at issue "must show that the defendant deliberately reached out beyond its home— by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (cleaned up). "Accordingly, we have upheld the assertion of jurisdiction over defendants who have purposefully reached out beyond their State and into another by, for example, entering a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State . . . . And although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State . . . is certainly a relevant contact." *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (cleaned up). With that said, "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* at 286. When conducting this purposeful availment analysis, courts must follow "the Supreme Court's admonition that the formation of a contract with a nonresident defendant is not, standing

1    alone, sufficient to create jurisdiction." *Boschetto*, 539 F.3d at 1017 (citing *Burger King*

2    *Corp. v. Rudzewicz*, 471 U.S. 462 (1985)). Thus, where there is a contract with a resident

3    party, in "determining whether the defendant purposefully established minimum contacts

4    within the forum," courts should evaluate the parties' "prior negotiations and contemplated

5    future consequences, along with the terms of the contract and the parties' actual course of

6    dealing." *Burger King*, 471 U.S. at 479.

7         In *Burger King*, the Supreme Court applied these factors and determined that the

8    district court in Florida had jurisdiction over the defendant. *Id.* at 478-82. The defendant

9    had entered into a franchise agreement with Burger King, a Florida corporation, which was

10   to last 20 years. *Id.* at 465-68. The governing contracts provided that the franchise

11   relationship was governed by Florida law and called for payment of all fees to Florida. *Id.*

12   at 465-66. Burger King's Florida headquarters would set franchise policy and resolve

13   major problems, and other offices would conduct day-to-day monitoring. *Id.* at 466. The

14   Court found that the defendant's contacts with Florida were substantial, given the

15   defendant's "voluntary acceptance of the long-term and exacting regulation of his business

16   from Burger King's Miami headquarters." *Id.* at 480. In reaching this conclusion, the

17   Court emphasized the parties' "20-year interdependent relationship," "that Burger King's

18   operations are conducted and supervised from the Miami headquarters, that all relevant

19   notices and payments must be sent there, . . . that the agreements were made in and enforced

20   from Miami," and the "provisions in the various franchise documents providing that all

21   disputes would be governed by Florida law." *Id.* at 479-82.

22        Like the defendant in *Burger King*, Plasma-Therm's contacts with the forum

23   jurisdiction are largely predicated on a contract it formed with a party at home in the forum

24   jurisdiction; and like the contract in *Burger King*, the APA was *not* merely a "one-shot

25   affair." *Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir. 1991) ("This is not an instance

26   where the contract was a one-shot deal that was merely negotiated and signed by one party

27   in the forum; on the contrary, most of the future of the contract would have centered on the

28   forum."). Although the facts in this case are somewhat different from *Burger King*, the

upshot is the same: the evidence in the record suggests that the terms of the APA and the anticipated course of dealing under the APA created a substantial connection with Arizona and that Plasma-Therm purposefully availed itself of the privilege of conducting business in this forum.

First, Plasma-Therm chose to undertake ongoing business operations within Arizona by entering into the APA.[11]  For example, under the APA, Plasma-Therm appears to have purchased a portion of OEM's inventory, "Tangible Assets," and intellectual property.  (Doc. 29-6 at 2-3.)  As a result, Plasma-Therm now maintains an office in Arizona and admits that the purpose of that office is to "handle and maintain engineering documentation and product support for a subset of product lines acquired from [OEM]." (Doc 22-1 ¶ 22.)  Moreover, it appears that at least two of the employees now working for Plasma-Therm's Arizona office were formerly employees of OEM.  (Doc. 29-7-13.  *See also* Doc. 19 ¶ 39 [uncontradicted allegation that Plasma-Therm stated in a letter that "most of the engineers, field service personnel, product managers, and support team that has supported [OEM's] products and your business, will now be part of the Plasma-Therm family"].)  Although a party's physical presence in the forum is not a prerequisite to jurisdiction, "physical entry into the State . . . is certainly a relevant contact."  *Picot v. Weston*, 780 F.3d 1206, 1213 (9th Cir. 2015) (citation omitted).  *See also Burger King*, 471 U.S. at 476 ("[T]erritorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there.")  Moreover, Plasma-Therm's physical presence in Arizona is not the type of "transitory presence" that may be insufficient to constitute purposeful availment.  *Cf. Picot*, 780 F.3d at 1213.  In *Picot*, for example, the court found that two isolated trips to California, in connection with an oral agreement, were insufficient to establish a "substantial connection" with the forum state.  *Id.*  In this case, however, it appears that Plasma-Therm has

---

[11]    The discussion of the APA in this portion of the order is not meant to provide a definitive interpretation of that contract, but only to establish that the "terms of the agreement" are sufficient under *Burger King* to establish purposeful availment.

maintained an office in Arizona for almost five years.  *See also Keeton v. Hustler Mag., Inc.*, 465 U.S. 770 (1984) ("[R]espondent is carrying on a 'part of its general business' in New Hampshire, and that is sufficient to support jurisdiction when the cause of action arises out of the very activity being conducted, in part, in New Hampshire.").

Second, Plasma-Therm appears to have assumed certain liabilities from OEM as part of the APA and agreed to indemnify OEM against third-party claims connected to those liabilities.  Although the extent of these liabilities has not been fully briefed, the evidence available at this time suggests that Plasma-Therm agreed to assume "all Liabilities in respect of the Assigned Contracts" outlined in Schedule 2.1 of the APA (Doc. 29-6 at 4), which included eight named agreements as well as"[p]urchase orders by and between [OEM] and third parties entered into in the ordinary course of Business" as outlined in a separate portion of the APA (*id.* at 14).  Plasma-Therm, moreover, agreed that OEM should notify it of any covered third-party claim, and if Plasma-Therm "denies liability in whole or in part or advises that the matters set forth in the notice are, or will be, subject to contest or legal proceedings not yet finally resolved, then [Plasma-Therm] shall assume and thereafter conduct the defense of the Third-Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party." (*Id.* at 11.)  Such an ongoing obligation to indemnify and defend is analogous to many insurance agreements that the Ninth Circuit has found sufficient to constitute purposeful availment.  *Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1480 (9th Cir. 1986) ("We conclude that Blue Cross, by voluntarily and knowingly obligating itself to provide health care coverage to Southwest's California employees, in exchange for premiums partly derived from premiums paid by California residents, purposefully availed itself of the benefits and protections of that forum."); *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 914 (9th Cir. 1990) ("[A]utomobile liability insurers contract to indemnify and defend the insured for claims that will foreseeably result in litigation in foreign states.  Thus litigation requiring the presence of the insurer is not only foreseeable, but it was purposefully contracted for by the insurer.") (citation omitted).  Here too, by apparently

1   agreeing to indemnify and defend OEM—an Arizona corporation amenable to suit in
2   Arizona—Plasma-Therm invoked the benefits and protections of Arizona law and agreed
3   to continuing business obligations in Arizona that were more than "random, fortuitous, or
4   attenuated."[12]

5                    b.      **Arise Out Of Or Relate To Forum-Related Activities**

6          Plaintiff next must demonstrate that its claims arise out of or relate to Plasma-
7   Therm's forum-related activities. *Picot*, 780 F.3d at 1211. "The Supreme Court announced
8   in *Ford* that 'arise out of' and 'relate to' are alternatives: for a claim to arise out of a
9   defendant's forum contacts requires causation, while a claim can relate to those contacts,
10  even absent causation.'" *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 504-05 (9th Cir. 2023)
11  (*citing Ford Motor Co.*, 592 U.S. at 362-63). For the causation analysis, the Ninth Circuit
12  relies "on a 'but for' test." *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995). Under
13  that test, "a lawsuit arises out of a defendant's contacts with the forum state if a direct nexus
14  exists between those contacts and the cause of action." *Fireman's Ins. Fun. Co. v. Nat'l
15  Bank of Coops.*, 103 F.3d 888, 894 (9th Cir. 1986). Meanwhile, a defendant's forum
16  contacts "relate to" a claim when "the defendant should have foreseen the risk that its
17  contacts might cause injuries like that of the plaintiff" or when "causation seems
18  particularly likely but is not always easy to prove." *Yamashita*, 62 F.4th at 505-06. The
19  Ninth Circuit has cautioned, however, that "*Ford* makes clear that 'relate to' 'does not
20  mean anything goes.'" *Id.* at 506.

21         The Ninth Circuit's decision in *Haisten v. Grass Valley Med. Reimbursement Fund*,
22  784 F.2d 1392 (9th Cir. 1986), suggests the but-for test is satisfied under these
23  circumstances. In *Haisten*, a California-based doctor purchased a malpractice policy from
24  a Cayman Islands provider. *Id.* at 1395. One year later, the doctor's wife sued him for

25  _____

26  [12]      Although Plasma-Therm argues that "Plaintiff's analysis is legally flawed because
    it fails to consider that the APA is governed by Delaware law" (Doc. 31 at 2), Plasma-
27  Therm has failed to cite any choice of law provision in the APA or otherwise explain why
    Delaware law controls. At any rate, Plasma-Therm has not explained why the application
28  of Delaware law would compel a different outcome.

malpractice.  *Id.*  She won a $185,000 arbitration award, after which the doctor declared bankruptcy.  *Id.*  The wife then sought satisfaction of her award by filing suit in federal court in California against the foreign insurance provider.  *Id.*  The insurance provider argued the court lacked specific jurisdiction but the Ninth Circuit rejected this argument.  *Id.* at 1396-1402.  The court first examined the insurance provider's contacts with California and concluded that, based on the insurance contract, the insurance provider had purposefully availed itself of the forum state's laws.  *Id.* at 1399-1400.  It then turned to the question of whether the dispute arose from those contacts.  *Id.* at 1400.  Because the plaintiff was "suing the [defendant] on the basis of its contract to provide indemnity" and the defendant's "forum-related activity consists of the contract," the Ninth Circuit held "that [the plaintiff] meets the second prong of the limited jurisdiction test."  *Id.*

Although it presents a closer call, the same logic applies here.  In the same way that the insurance provider in *Haisten* purposefully availed itself of the forum state's laws based on an insurance contract, Plasma-Therm purposefully availed itself of Arizona law based on the APA.  And, as in *Haisten*, Plaintiff is suing Plasma-Therm on the basis of its forum-related activity—specifically, its alleged contractual obligations under the APA to indemnify OEM and assume responsibility for performance of the Contract.  In three separate portions of the APA, Plasma-Therm appears to assume "the current backlog related to open customer purchaser orders incurred in the ordinary course of business as set forth on Schedule 2.3."  (Doc. 29-6 at 4.)  First, under Section 2.3(b) of the APA, Plasma-Therm agreed to assume the backlog "set forth on Schedule 2.3" as an independent "Assumed Liability."  (*Id.*)  Second, under Section 2.3(c), Plasma-Therm agreed to assume "all Liabilities in respect of the Assigned Contracts," a defined term which includes "the Contracts set forth on Schedule 2.1(c)" (*id.* at 2), which Schedule in turn includes "[p]urchase orders by and between OEM Group, LLC and third parties entered into in the ordinary course of the Business set forth in Schedule 2.3 below."  (*Id.* at 14.)  Third, under Section 2.3(e) of the APA, Plasma-Therm agreed to assume "all Liabilities to customers for products or services of the Business that have not yet been delivered or rendered as of

the Closing with respect to the backlog set forth on <u>Schedule 2.3</u>." (*Id.* at 4.)  Looking at Schedule 2.3 directly, the document refers to an exhibit entitled "Current Backlog Related to Open Customer Purchase Orders (Systems and Parts)" (*id.* at 15) which includes the following entry:

| Order Type | Bill To Name | Sales Order Number | Sum of Remaining SO Revenue | Sum of Orig Value |
|---|---|---|---|---|
| PROJECT | .... | .... | .... | .... |
| | Jiang CorEnergy Semiconductor | 194849A | 63,000 | 630,000 |

(*Id.* at 42.)    Together, these provisions suggest that Plasma-Therm assumed OEM's liabilities regarding Plaintiff's "open customer purchase order[]" with OEM, *i.e.*, the Contract at issue in this lawsuit.  Thus, to the extent Plaintiff has a viable claim against Plasma-Therm, that claim would not exist "but for" the APA, which for the reasons discussed above is a relevant jurisdictional contact with Arizona.  *See also Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995) ("The question, therefore, is this: but for [defendant's] contacts with the United States and California, would Ballard's claims against the [defendant] have arisen?").

In addition, Plaintiff's claims against Plasma-Therm appear to be based on Plasma-Therm's business operations in Arizona—another relevant jurisdictional contact.  The FAC alleges that, after Plaintiff purchased the Eclipse from OEM and "the Eclipse was delivered to [Plaintiff] with various manuals and components missing" (Doc. 19 ¶ 30), Plaintiff asked OEM to cure these deficiencies (*id.* ¶ 32) and later asked the same from Plasma-Therm after it acquired a portion of OEM's assets (*id.* ¶¶ 42-43).    Plasma-Therm admits it maintains an office in Arizona for the purpose of "handl[ing] and maintain[ing] engineering documentation and product support for a subset of product lines acquired from [OEM]" (Doc 22-1 ¶ 22), and Plaintiff alleges (and Plasma-Therm does not deny) that the Eclipse product line was one of the product lines acquired by Plasma-Therm from OEM under the APA.  (Doc. 19 ¶¶ 35, 37.)  Together, these facts suggest that to the extent Plasma-Therm may have an obligation to cure deficiencies in Plaintiff's order, its failure to fulfill that obligation is tied to its business activities in Arizona, which it admits are for

1    the purpose of supporting Eclipse customers.

2          Alternatively, even if causation is debatable on this limited record, it is clear that

3    Plaintiff's claims against Plasma-Therm "relate to" Plasma-Therm's contacts with

4    Arizona.  In *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079 (9th Cir. 2023), the

5    Ninth Circuit analyzed personal jurisdiction under the "relates to" test in the context of a

6    declaratory judgment action for trademark non-infringement.  In that case, the plaintiff,

7    Impossible Foods, and the defendant, Impossible X, both used a similar "IMPOSSIBLE"

8    trademark as part of their businesses, and when the "U.S. Patent and Trademark Office

9    (USPTO) published for opposition three trademark applications filed by Impossible

10   Foods," Impossible X responded by sending a cease-and-desist letter and "fil[ing] a notice

11   of opposition before the USPTO Trademark Trial and Appeal Board (TTAB)." *Id.* at 1083-

12   85.   In response, Impossible Foods sued Impossible X in California district court,

13   requesting a declaratory judgement for noninfringement.   *Id.* at 1085.   Even though

14   Impossible X had operated out of California for two years, it argued that personal

15   jurisdiction was improper because its business had later moved to Texas and its California

16   operations had taken place several years before the trademark dispute.  *Id.* at 1082-84.

17   According to Impossible X, its only relevant jurisdictional contacts were the cease-and-

18   desist letter and the opposition to Impossible Foods' trademark application, because a

19   declaratory judgement for non-infringement can only "arise[] out of or relate to trademark

20   *enforcement activities in the forum state*." *Id.* at 1092.  The court rejected this reasoning,

21   finding instead that the declaratory judgment action "related to" the defendant's other

22   activities in California because a "core situs for [the defendant's] trademark building and

23   trademark use was California" and "[t]he California contacts . . .  are relevant to an

24   assessment of Impossible X's trademark usage, and thus to its claimed rights in the

25   IMPOSSIBLE mark." *Id.* at 1096.  *See also id.* at 1087 ("Impossible Foods' declaratory

26   judgment action 'arises out of or relates to' Impossible X's conduct in California because

27   its trademark building activities form the basis of the contested trademark rights—rights

28   which Impossible X broadly asserted in the TTAB opposition that triggered this action.").

Here, Plasma-Therm's Arizona activities are "related to" Plaintiff's claims in a similar way. Even if, as Plasma-Therm contends, Plaintiff's breach of contract claims do not "arise" directly out of the APA or Plasma-Therm's operations in Arizona, these contacts are still "relevant to an assessment of" the parties' rights at issue. In the same way that the court in *Impossible Foods* needed to assess the defendant's contacts with California to understand the parties' trademark rights, so too in this case the Court must assess Plasma-Therm's contacts with Arizona to understand Plaintiff's rights and Plasma-Therm's obligations under the Contract. In both cases, it would be impossible to analyze the merits of Plaintiff's claims without considering the specific jurisdictional contacts connecting Plasma-Therm to the forum jurisdiction. Plaintiff's claims, therefore, "relate[] to" Plasma-Therm's contacts with Arizona.

This case is also analogous to products liability cases where courts have found that a defendant's contacts with the forum jurisdiction "relate[] to" the cause of action. In *Ford*, the Supreme Court found that Ford was subject to personal jurisdiction for injuries caused by a Ford Explorer in Montana and a Ford Crown Victoria in Minnesota, even though the cars were sold in different states, because Ford advertised to consumers in Montana and Minnesota and maintained dealers in the forum states that "regularly maintain and repair Ford cars." 592 U.S. at 363-65. Drawing from *Ford*, the Ninth Circuit in *Yamashita* suggested that a foreign defendant's contacts with the forum jurisdiction will "relate to" a plaintiff's injury when the "[defendant] should have foreseen the risk that its contacts might cause injuries *like that* of the plaintiff." *Yamashita*, 62 F.4th at 505-06 (emphasis added). In this case, Plasma-Therm appears to have assumed liability for a variety of contracts involving an Arizona corporation and maintained an office in Arizona expressly for the purpose of providing customer support for customers using the Eclipse product line. Under the logic of *Yamashita*, Plasma-Therm could easily foresee that it would be sued in Arizona for OEM's liabilities or by customers dissatisfied with an Eclipse product.

In disputing personal jurisdiction, Plasma-Therm relies on a contrary interpretation of the APA, arguing that it did not, in fact, assume the Contract. This interpretation is

unpersuasive. First, Plasma-Therm argues that "[t]he APA unequivocally restricts the contracts assumed by Plasma-Therm to those specifically identified as 'Assigned Contracts' on Schedule 2.1(c), but only to the extent that such contracts require performance after the APA Closing Date." (Doc. 31 at 2, citing Doc. 29-6 at 4 [Section 2.3(c)].) The problem with this argument is that the backlog of customer orders is included among the Assigned Contracts. Although Plasma-Therm is correct that Section 2.3(c) appears to limit Plasma-Therm's liabilities for the Assigned Contracts to those liabilities arising after the date of closing (Doc. 29-6 at 4), Plasma-Therm is incorrect that this limitation is "unequivocal[]." The full text of the APA provision reads:

> Purchaser shall assume and agree to pay, perform and discharge . . . all Liabilities in respect of the Assigned Contracts but only to the extent that such Liabilities thereunder are required to be performed or arise after the Closing Date, were incurred in the ordinary course of business (to the extent such Liability does not arise out of or relate to any breach, default, improper performance or violation by Seller of such Assigned Contract on or prior to the Closing Date, *other than those that relate, or may relate, to any penalties, fees, or other similar payments owed as a result of delayed delivery with respect to the backlog set forth on Schedule 2.3.*)

(*Id.*) Although this provision is not a model of clarity, the final clause (emphasized in italics) suggests that the post-closing limitation on Plasma-Therm's assumption of liability may not apply in the same way to pre-closing liabilities "with respect to the backlog set forth on Schedule 2.3." This would make sense because two other sections of the APA— Section 2.3(b) and Section 2.3(e)—separately assign Plasma-Therm responsibility for the open customer backlog in Schedule 2.3, but without any limitations on liability similar to those regarding the Assigned Contracts. These omissions suggest that Plasma-Therm's liabilities for the customer backlog are not limited to those liabilities "aris[ing] after the Closing Date."

Perhaps for this reason, Plasma-Therm also argues that "[a]lthough the APA acknowledges that Plasma-Therm assumed certain liabilities related to the backlog of open customer purchase orders listed in Schedule 2.3, it does not explicitly provide for the assumption of all terms and obligations of those respective customer contracts." (Doc. 31

at 2-3.)  This observation, however, is misleading.  As noted in the previous paragraph, the APA specifically lists the "backlog of open customer purchase orders" among the "Assigned Contracts" in Schedule 2.1(c).  (Doc. 29-6 at 14.)  This inclusion suggests the parties considered the underlying contracts to be part of the liabilities that Plasma-Therm assumed with respect to the customer backlog.  And, as already stated above, the limitations on liability in Section 2.3(c) do not apply to the backlog of open customer orders in the same way they apply to the other Assigned Contracts.

Last, Plasma-Therm argues that the Contract between OEM and Plaintiff was not, in fact, included in the "Current Backlog Related to Customer Purchase Orders" because "a critical discrepancy exists: the Sales Order Number (194849A) listed in Exhibit 2.3(b)(i) does not match the Contract's Sales Order Number, demonstrating that performance of the Contract was not included among the assumed liabilities."  (Doc. 31 at 3.)[13]  On the one hand, it is true that the APA states that Plasma-Therm assumed liability for Order Number 194849A but the FAC alleges that Plasma-Therm is liable for "Quotation #194849 B" (Doc. 19 ¶ 21) and "Contract No. 20190306B" (*id.* at 16).  On the other hand, and notwithstanding this discrepancy, it is not clear that the APA in fact refers to a different contract.  Notably, the quotation number is explicitly referenced in the Contract, No. 20190306B, which provides: "This contract is made by and between the Buyer and the Seller according to QUOTATION NO: #194849 B."  (*Id.*)  The first six digits of the order number listed in the APA match the quotation number alleged in the FAC.  Although the final letter ("A" versus "B") is different in each document, this difference only seems to indicate a specific "Revision" of the quotation rather than an entirely separate order:



---

[13]    As mentioned in the Jurisdictional Facts, Exhibit 2.3(b)(i) is explicitly cross-referenced in Schedule 2.3, which outlines Plasma-Therm's assumed liabilities under Section 2.3(a)-(e) in greater detail.  (Doc. 29-6 at 14, 42.)

(*Id.* at 20.)  It is reasonable to infer, therefore, that these two numbers refer to the same order.  Such an inference is strengthened by the total price of Order No. 194849A, which is listed in the APA under Exhibit 2.3(i).  (Doc. 29-6 at 42.)  That number—$630,000—is the same amount that Plaintiff agreed to pay OEM for the Eclipse (Doc. 19 at 16), and neither party has presented evidence that there were other contracts between Plaintiff and OEM.  The synchronicity between these two numbers further suggests that Order No. 194849A and "Quotation #194849 B" are both the same customer order that Plasma-Therm agreed to assume as part of the APA.

Although the discussion above is not intended as a definitive interpretation of the APA and the discrepancies between the APA and the Contract still leave several questions unanswered, those questions need not be resolved at this time.  Instead, Plaintiff is only required to make a *prima facie* showing of jurisdictional facts, and "[f]or the purposes of deciding whether a prima facie showing has been made, the court resolves all disputed facts in favor of the plaintiff."  *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) (cleaned up).

### c.    **Fair Play And Substantial Justice**

"[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Burger King*, 471 U.S. at 477.  "[M]inimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities."  *Id.* at 477-78.  "[J]urisdictional rules may not be employed in such a way as to make litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent."  *Id.* at 478 (quotation marks omitted).

"In determining reasonableness, seven factors are considered: (1) the extent of a defendant's purposeful interjection; (2) the burden on the defendant in defending in the

forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1021 (9th Cir. 2002). "As no single factor is dispositive, a court must balance all seven." *Id.*

Plasma-Therm has not presented a compelling case that the exercise of jurisdiction would be unreasonable. Plasma-Therm interjected itself into Arizona by purchasing substantial assets here and continuing to maintain an office here. Arizona has an interest in adjudicating the dispute because Arizona has an interest in protecting the rights of customers that do business with Arizona corporations that are later purchased by out-of-state entities. That Plasma-Therm continues to maintain an office in Arizona also suggests it would not be unfairly inconvenient for Plasma-Therm to litigate here. And although Florida may present a more convenient forum for Plasma-Therm, so long as OEM remains a party to this case it would be inconvenient and inefficient for Plaintiff to be forced to litigate in both Florida and in Arizona simultaneously. For these reasons, the factors outlined in *Rio Properties* weigh in favor of the reasonable exercise of personal jurisdiction over Plasma-Therm in Arizona.

### D.    **Subject-Matter Jurisdiction**

#### 1.    The Parties' Arguments

Plasma-Therm argues that "[t]he Court is compelled to dismiss the Complaint in its entirety because it lacks subject matter jurisdiction over the dispute." (Doc. 22 at 3.) Specifically, Plasma-Therm argues that federal-question jurisdiction is lacking because "[t]he federal question statute, 28 U.S.C. § 1331, confers subject matter jurisdiction over actions arising under, inter alia, the CISG," but "Plasma-Therm is neither a party to the contract nor a party to the underlying transaction" and the "CISG applies exclusively to buyers and sellers and does not extend to third parties." (*Id.*)

In response, Plaintiff argues that the "APA makes clear that Plasma-Therm is

bound" by the Contract and "[a]s such, there is federal question jurisdiction for the CISG claim." (Doc. 28 at 31.) Further, Plaintiff argues that "[e]ven setting this aside, there is diversity jurisdiction because the parties (foreign and U.S. companies), are completely diverse." (*Id.* at 31-32, citation omitted.)

In reply, Plasma-Therm reiterates that "this Court lacks subject matter jurisdiction over this action against Plasma-Therm" because Plasma-Therm is "a non-party to the Contract." (Doc. 31 at 4.)

2.    Analysis

a.    **Federal-Question Jurisdiction**

The federal-question statute, 28 U.S.C. § 1331, confers subject-matter jurisdiction over "all civil actions arising under," *inter alia*, "treaties of the United States." The CISG is a multilateral treaty that applies to certain "international sales contracts," including "contracts of sale of goods between parties whose places of business are in different States . . . when the States are Contracting States.'" *Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 530 (9th Cir. 2003) (citations omitted). The CISG "creates a private right of action in federal court," *BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 336 (5th Cir. 2003), and both the United States and China are Contracting States, *Dongguan Jianqun Co., Ltd. v. Consol. Shoe Co., Inc.*, 2022 WL 4593098, *4 (W.D. Va. 2022). However, the CISG "governs only the formation of the contract of sale and the rights and obligations of the seller and the buyer arising from such a contract." *Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 674 (N.D. Ill. 2005) (emphasis added) (quoting CISG, art. 4).

Neither Plaintiff nor Plasma-Therm dispute that, under the CISG, the Court has federal-question jurisdiction over Plaintiff's claims against OEM. As for Plaintiff's CISG-based claims against Plasma-Therm, the parties disagree. Plaintiff's argument is that the Court also has federal-question jurisdiction over these claims because Plasma-Therm assumed OEM's obligations under the Contract and the Contract is governed by the CISG. There is a paucity of caselaw on this subject. *Delchi Carrier SpA v. Rotorex Corp.*, 71

F.3d 1024, 1027-28 (2d Cir. 1995) ("Because there is virtually no caselaw under the Convention, we look to its language and to 'the general principles' upon which it is based."). *See also MCC–Marble Ceramic Center, Inc. v. Ceramica Nuova d'Agostino, S.p.A.*, 144 F.3d 1384, 1389 (11th Cir.1998) ("Despite the CISG's broad scope, surprisingly few cases have applied the Convention in the United States."). Acknowledging the unsettled and debatable nature of the issue, the Court concludes that, even assuming Plasma-Therm took over OEM's obligations under the Contract, the Court does not have federal-question jurisdiction over Plaintiff's claims against Plasma-Therm.

The analysis begins, as it must, with the plain language of the treaty. *Medellin v. Texas*, 552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."). *See also United States v. Hanousek*, 176 F.3d 1116, 1120 (9th Cir. 1999) ("Statutory interpretation begins with the plain language of the statute."). The CISG, by the express terms of Article 4, "governs *only* the formation of the contract of sale and the rights and obligations *of the seller and the buyer* arising from such a contract." CISG, art. 4 (emphasis added). This language suggests that an action under the CISG is narrowly limited to cases adjudicating the rights of buyers and sellers—two categories that do not include Plasma-Therm.

Courts in other jurisdictions have reached similar conclusions. In *Usinor Industeel v. Leeco Steel Prods., Inc.*, 209 F. Supp. 2d 880 (N.D. Ill. 2002), a French steel manufacturer sold an American buyer a quantity of steel "valued in excess of one million dollars," which the buyer purchased using credit from a third-party bank. *Id.* 881-82. When the buyer stopped making payments on the steel, the steel manufacturer sought replevin under state law or, in the alternative, avoidance of the contract under the CISG. *Id.* Meanwhile, the third-party bank intervened in the action, claiming that it had a security interest in the purchased steel superior to the seller's interest. *Id.* at 883. The steel manufacturer argued that the CISG should apply to the parties' dispute because the third-party creditor "had no interest in the Steel before it was sold, and . . . [its] interest entirely arises out of the existence of the sales contract between [the buyer and seller], and that

1    contract is governed by CISG." *Id*.  The court rejected that argument, concluding that
2    although the CISG might have allowed the seller to avoid the contract in the absence of a
3    third-party creditor, "the CISG's rules are limited (art. 4) to the rights 'of the seller and the
4    buyer' and yield to the rights of third persons such as creditors and purchasers." *Id.* at 886.
5    As a result, the court declined to apply the CISG and instead applied domestic law to
6    interpret the "retention of title clause" in the sale contract and to determine the parties'
7    respective rights. *Id.* at 887-88.

8         Similarly, in *Caterpillar*, the court found that the CISG did not preempt the
9    plaintiff's state-law and UCC claims against a third-party upstream seller because there
10   was no direct buyer-seller relationship between the parties.  393 F. Supp. 2d at 674
11   ("CMSA, not Caterpillar, bought the steel from Leeco, Usinor's agent.  As such, only
12   CMSA can assert claims under the CISG . . . .").  *Caterpillar* cited *Usinor Industeel* in
13   rejecting the argument that "the holding of *Usinor Industeel* should be limited to situations
14   where the third party's interest is in title to the goods." *Id.*  Although the CISG might
15   preempt UCC and state-law claims under different circumstances, *see Kumpers*
16   *Composites GmbH & CoKG v. TPI Composites Inc.*, 2025 WL 603734, *9 (D. Ariz. 2025),
17   *Caterpillar* emphasized that Article 4 explicitly limits the application of the CISG to
18   disputes between buyers and sellers.  *Caterpillar*, 393 F. Supp. 2d at 676.  *See also*
19   *Kumpers Composites*, 2025 WL 603734 at *9 ("[T]he CISG will not preempt state law
20   causes of action that fall outside the scope of federal law.").

21        Like the steel manufacturer in *Usinor Industeel*, Plaintiff essentially argues that the
22   CISG controls the parties' dispute because, without a pre-existing agreement between the
23   buyer and seller, there could be no dispute with the third party (Plasma-Therm).  Plaintiff's
24   relationship to Plasma-Therm, however, is analogous to the relationship between the buyer
25   and the upstream seller in *Caterpillar*.  In both cases, no direct buyer-seller relationship
26   exists.  So, in the same way that the court in *Unisor Industeel* found it appropriate to
27   interpret the "retention of title clause" in the sale contract using domestic law, the Court
28   here likewise determines that domestic law is the appropriate vehicle to adjudicate Plasma-

Therm's rights and obligations under the Contract. Thus, Plaintiff's claims against Plasma-Therm do not "aris[e] under" the CISG, as required to support a claim of federal-question jurisdiction. *See also* Henry Mather, *Choice of Law for International Sales Issues Not Resolved by the CISG*, 20 J.L. & Com. 155, 160 (2001) ("Because of the article 4 third-party exclusion, the CISG does not govern issues that arise when one party assigns one or more of her contractual rights.").[14]

### b.    **Diversity Jurisdiction**

In the alternative to federal-question jurisdiction, Plaintiff argues that diversity jurisdiction exists "because the parties (foreign and U.S. companies), are completely diverse." (Doc. 28 at 31-32, citations omitted.) Although Plasma-Therm fails to respond to Plaintiff's argument on this point, the Court has an independent obligation to determine whether it has subject-matter jurisdiction. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).

Diversity jurisdiction exists when there is complete diversity of citizenship between the plaintiff and the defendants and the amount in controversy exceeds $75,000, exclusive of interests and costs. 28 U.S.C. § 1332. A controversy meets this requirement when "all the persons on one side of it are citizens of different states from all the persons on the other side." *Strawbridge v. Curtiss*, 7 U.S. 267 (1806).

The party seeking to invoke diversity jurisdiction has the burden of proof, *Lew v. Moss*, 797 F.2d 747, 749-50 (9th Cir. 1986), by a preponderance of the evidence. *McNatt v. Allied-Signal, Inc.*, 972 F.2d 1340 (9th Cir. 1992); *see* 13B Federal Practice § 3611 at 521 & n.34. "Absent unusual circumstances, a party seeking to invoke diversity jurisdiction should be able to allege affirmatively the actual citizenship of the relevant

---

[14]    Although the Mather article relies on citations to tribunals in Germany and Switzerland, the CISG should "be informed by its international character and . . . the need to promote uniformity in its application and the observance of good faith in international trade." *Delchi Carrier SpA*, 71 F.3d at 1028 (quoting CISG, Art. 7(1)). *See also Unisor Industeel*, 2019 F. Supp. 2d at 886 (citing an Australian court case and noting that "[w]hile this case is far in distance from the present jurisdiction, commentators on the CISG have noted that courts should consider the decisions issued by foreign courts on the CISG").

1   parties." *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001).

2       Plaintiff alleges in the FAC that it is a "company organized under the laws of China

3   with its registered business at B-12, No. 2 Fuxin Road Zhangjiagang, Jiangsu, China"; that

4   OEM is an LLC "organized under the laws of Delaware with its principal place of business"

5   in Arizona; and that Plasma-Therm is an LLC "organized under the laws of Florida with a

6   principal place of business" in Arizona. (Doc. 19 ¶¶ 8-10.)

7       These allegations are insufficient to establish diversity jurisdiction. A corporation,

8   whether incorporated in a state of the United States or in a foreign country, is "deemed a

9   citizen of its place of incorporation and the location of its principal place of business."

10  *Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 990 (9th Cir.

11  1994). But this is not the standard for establishing the citizenship for diversity purposes of

12  an LLC such as OEM or Plasma-Therm. An LLC "is a citizen of every state of which its

13  owners/members are citizens." *Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d

14  894, 899 (9th Cir. 2006). Thus, to properly establish diversity jurisdiction "with respect to

15  a limited liability company, the citizenship of all of the members must be pled." *NewGen,*

16  *LLC v. Safe Cig, LLC*, 840 F.3d 606, 611 (9th Cir. 2016).

17      The Court recognizes that Plasma-Therm attached a declaration to its motion to

18  dismiss identifying its four original "managers," "all of whom were residents of Florida,"

19  and also identifying its five current "officers." (Doc. 22-1 ¶¶ 3-4, 8.) As an initial matter,

20  these averments are, on their face, insufficient to establish Plasma-Therm's citizenship,

21  both because "a mere averment of residence in a particular state is not an averment of

22  citizenship in that state for the purpose of jurisdiction," *Steigleder v. McQuesten*, 198 U.S.

23  141, 143 (1905), and because the declaration does not purport to identify Plasma-Term's

24  "members," let alone identify their citizenship. Additionally, and more important, the rule

25  in the Ninth Circuit is that "with respect to a limited liability company, the citizenship of

26  all of the members must be *pled*." *NewGen, LLC*, 840 F.3d at 611 (emphasis added). *See*

27  *also Doe v. Hosbach*, 2024 WL 5146855, *3 n.5 (D.N.J. 2024) ("The Court recognizes that

28  Plaintiff filed a Diversity Disclosure Statement listing her state of citizenship as

Pennsylvania, but where the facts establishing complete diversity do not appear on the face of the complaint, it is defective from a jurisdictional standpoint.") (cleaned up). *See generally* Fed. R. Civ. P. 8(a)(1) ("A pleading . . . must contain . . . a short and plain statement of the grounds for the court's jurisdiction . . . ."). At any rate, there is no information anywhere in the FAC, or anywhere else in the record, concerning the identity or citizenship of OEM's members.

Therefore, the FAC fails to properly allege diversity jurisdiction.

### c.    **Supplemental Jurisdiction**

Although the FAC alleges "[t]his Court has supplemental jurisdiction over this action under 28 U.S.C. § 1367" (Doc. 19 at 14), neither party addressed this issue in their briefs. Notwithstanding those omissions, the Court's independent obligation to determine jurisdiction compels additional consideration.

Under 28 U.S.C. § 1367(a), the court has supplemental jurisdiction over a claim "in any civil action of which the district courts have original jurisdiction," where the additional claim is "so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Notably, "[s]uch supplemental jurisdiction shall include claims that involve the joinder . . . of additional parties." *Id.* "Thus, so long as the state-law claims against one defendant constitute part of the same constitutional case as the federal claims against a co-defendant, the district court has the power to exercise supplemental jurisdiction." *Sacco v. APS Elec. Co.*, 2020 WL 6741540, *1 (D. Ariz. 2020) (cleaned up) (citing *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1174 (9th Cir. 2002)). *See also Nowick v. Gammell*, 351 F. Supp. 2d 1025, 1038 (D. Haw. 2004) ("Plaintiff also raises a number of state law claims against Defendant KHVO . . . [which] asks the Court to dismiss these claims for lack of subject matter jurisdiction. However, the Court has not dismissed Plaintiff's federal law claims against Defendant Adventure Resorts, and therefore retains jurisdiction over Plaintiff's state law claims against Defendant KHVO, as they arise from the same transaction or occurrence.").

Two claims are part of the same "case or controversy" under Article III when they share "a common nucleus of operative fact." *Bale v. Gen. Tel. Co. of California*, 795 F.2d 775 (9th Cir. 1986) (*citing United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). However, even if two claims form part of the same case or controversy, district courts have discretion to decline supplemental jurisdiction over a claim when:

(1)    the claim raises a novel or complex issue of State law,

(2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)    the district court has dismissed all claims over which it has original jurisdiction, or

(4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).[15]

Plaintiff's claims against Plasma-Therm are so related to Plaintiff's claims against OEM—over which the Court clearly possesses federal-question jurisdiction—that they form part of the same "case or controversy" under Article III. Plaintiff's claims against Plasma-Therm and OEM both turn on the events surrounding delivery of the Eclipse, the condition of the Eclipse following delivery, and the parties' alleged obligations under the Contract to cure any defect. Courts in the Ninth Circuit have frequently found that contract claims can be subject to supplemental jurisdiction when they arise from the same facts triggering a claim under federal law. *See, e.g.*, *Levy Prod. Grp., LLC v. R&R Partners, Inc.*, 658 F. Supp. 3d 901, 912 (D. Nev. 2023) (breach of contract claim "stem[med] from the same alleged misconduct" giving rise to a separate conversion claim preempted by Copyright Act); *Carton v. B & B Equities Grp., LLC*, 827 F. Supp. 2d 1235, 1241, 1250 (D. Nev. 2011) (state-law claims for "breach of investment agreement" and "breach of loan documents" arose "from the defendants['] participation in the [stranger-originated life insurance] arrangement," which also formed basis for federal securities fraud claim). Thus,

---

[15]    Because this case is not one of those civil actions "of which the district courts have original jurisdiction founded solely on [diversity jurisdiction]," the additional exceptions to supplemental jurisdiction listed in 28 U.S.C. § 1367(b) do not apply.

to the extent Plaintiff has successfully stated a claim or claims against Plasma-Therm (discussed below), any such claims form part of the same case or controversy as Plaintiff's claims against OEM.

None of the factors under 28 U.S.C. § 1367(c) counsel against retaining supplemental jurisdiction. At this stage of litigation, there is no suggestion that Plaintiff's claims will raise a novel or complex issue of state law. Plaintiff's claims against Plasma-Therm do not predominate over Plaintiff's claims against OEM. The Court has not dismissed Plaintiff's claims against OEM over which it retains original jurisdiction. And there appear to be no other exceptional circumstances or compelling reasons that counsel against the exercise of jurisdiction.

III.   Plasma-Therm's Motion To Dismiss For Failure To State A Claim

A.   **Legal Standard**

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

B.   **General Arguments For Dismissal**

1.   The Parties' Arguments

In addition to challenging Plaintiff's request to compel arbitration in Count One (a

- 47 -

challenge resolved in earlier portions of this order), Plasma-Therm argues that all of Plaintiff's original claims (which are now Counts Two through Four of the FAC) should be dismissed based on five "Common Grounds for Dismissal." (Doc. 22 at 10-11.) First, Plasma-Therm argues that all of Plaintiff's claims assume that Plasma-Therm is bound by the Contract, but "[w]hether the Contract binds Plasma-Therm cannot be resolved." (*Id.* at 10.) According to Plasma-Therm, this is because "the question of whether the Contract extends to Plasma-Therm falls outside the scope of the CISG," Plaintiff has not identified any other "applicable law," and "[t]he Court should refrain from selecting applicable law on its own, as Plasma-Therm has not been properly notified according to Rule 44.1 Fed. R. Civ. P." (*Id.*) Second, Plasma-Therm argues that "the CISG does not apply to it or its conduct" because "Plasma-Therm is not the seller under the Contract" as required by CISG Art. 4. (*Id.* at 11.) Third, Plasma-Therm argues that the FAC is a "fundamentally flawed 'shotgun' pleading" that "comingle[s] multiple, independent legal theories into each cause of action" and "fails to specify which of the Defendants are responsible for which acts or omissions." (*Id.*) Fourth, Plasma-Therm argues that Plaintiff "is clearly [making] an argument for successor liability" but successor liability "falls outside the scope of the CISG" and Plaintiff "fail[s] to plead the necessary facts to support this theory, specifically the transfer of all or substantially all of OEM's assets." (*Id.*) Fifth, even assuming that Plasma-Therm was OEM's successor, Plasma-Therm argues that a successor corporation "will not be liable for the debts and liabilities of the former, absent some exception" and in this case "[n]o such exception has been plead[ed]." (*Id.*)

In response, Plaintiff interprets Plasma-Therm's first argument as being that "uncertainty about whether the Contract is binding on Plasma-Therm removes federal-question jurisdiction because it puts this claim outside the scope of the CISG." (Doc. 28 at 31, cleaned up.) To rebut this argument, Plaintiff argues that "the APA makes clear that Plasma-Therm is bound" and "[e]ven setting [federal question jurisdiction] aside, there is diversity jurisdiction because the parties . . . are completely diverse." (*Id.* at 31-32.) Plaintiff further argues that "Plasma-Therm's express assumption of the Contract also

resolves each of its second through fifth 'common' arguments for dismissal, which all assume that there was no express assumption." (*Id.* at 32.)  With regard to Plasma-Therm's successor liability arguments, Plaintiff argues that it has properly alleged successor liability because even though Plasma-Therm "conclusorily denies 'the transfer of all or substantially all of OEM's assets,'" such a transfer "did occur here, given that OEM has wound down operations in the aftermath of the sale to PT." (*Id.*)  Further, Plaintiff argues that "'total' transfer" is not the only way that successor liability can arise, and instead successor liability may also exist when "there is an express or implied agreement of assumption" or "the transaction amounts to a consolidation or merger of the two corporations" which, according to Plaintiff, is exactly what happened here. (*Id.*)

In reply, Plasma-Therm argues that "Plaintiff's Response is devoid of any argument that would support the sufficiency of the claims against Plasma-Therm.  Instead, Plaintiff relies on misguided interpretations of applicable law and attempts to satisfy its pleading burden by introducing issues and facts not raised in the Complaint—all of which are ultimately predicated on the erroneous assumption that Plasma-Therm assumed the Contract through the APA." (Doc. 31 at 5.)

## 2.    Identification Of Applicable Law

Contrary to Plasma-Therm's argument, Plaintiff is not required to allege the law governing Plasma-Therm's obligations under the Contract in order to survive a motion to dismiss.  All that Rule 8(a)(1) requires is "a short and plain statement of the claim showing that the pleader is entitled to relief."  The "Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014).  In *Johnson*, a group of police officers sued the city of Shelby, Mississippi, seeking compensatory relief for "violations of their Fourteenth Amendment due process rights." *Id.* at 10.  Following discovery, the District Court entered summary judgment against the plaintiffs because they had failed to invoke 42 U.S.C. § 1983 in their complaint, and the Fifth Circuit affirmed. *Johnson*, 574 U.S. at 10.  The Supreme Court reversed, rejecting an argument that the

1    appropriate statute needs to be alleged in the complaint simply because "certain

2    consequences flow from claims under § 1983." *Id.* at 11-12. Here, too, dismissal is not

3    warranted simply because Plaintiff has not alleged the application of any law beside the

4    CISG to determine Plasma-Therm's rights and obligations under the Contract. Even if, for

5    the reasons discussed in this order, the CISG does not apply to Plasma-Therm, and even if

6    "certain consequences flow" from the selection of some other applicable law, those

7    consequences do not require Plaintiff to satisfy a pleading standard going beyond the

8    ordinary requirements of Rule 8.

9        To the extent Plasma-Therm argues that Rule 44.1 requires Plaintiff to plead the

10   applicable foreign law to survive a motion to dismiss, that argument is unpersuasive. Rule

11   44.1 requires that "[a] party who intends to raise an issue about a foreign country's law

12   must give notice by a pleading or other writing." The plain text of the rule makes clear

13   that parties are not always required to include notice of a foreign law issue in their pleading

14   but can also provide notice in "other writing." At this early point in the proceedings, it is

15   not yet clear that any foreign law will be raised. And, in any case, courts in the Ninth

16   Circuit only require the timing of a notice under Rule 44.1 to be "reasonable." *DP Aviation*

17   *v. Smiths Indus. Aerospace & Def. Sys. Ltd.*, 268 F.3d 829, 846 (9th Cir. 2001). *See also*

18   *id.* ("We have previously said that Rule 44.1 allows the court to consider issues of foreign

19   law at any time and that absent special circumstances, parties should present issues of

20   foreign law in their appellate briefs at the latest. However, . . . [a]bsent extenuating

21   circumstances, notice of issues of foreign law that reasonably would be expected to be part

22   of the proceedings should be provided in the pretrial conference and contentions about

23   applicability of foreign law should be incorporated in the pretrial order."). *See also* Fed.

24   R. Civ. P. 44.1, advisory committee's note to 1966 adoption ("The new rule does not

25   attempt to set any definite limit on the party's time for giving the notice of an issue of

26   foreign law; in some cases the issue may not become apparent until the trial and notice then

27   given may still be reasonable.");[16] 1 Gensler, Federal Rules of Civil Procedure, Rules and

28   _____

[16]    The 2007 amendments to Rule 44.1 eliminated the specific requirement that "other

1    Commentary, Rule 44.1 (2024) ("In many situations, a party will know at the pleading

2    stage that a foreign law issue will be involved.  But in other situations, the foreign law issue

3    will not become evident until later in the lawsuit.  Accordingly, Rule 44.1 allows a party

4    to raise the foreign law issue in a writing other than the pleadings.").

5                      3.    <u>Assumption Of The Contract</u>

6            Plaintiff sufficiently alleges facts giving rise to an inference that Plasma-Therm

7    assumed OEM's obligations under the Contract (which is a theory of liability distinct from

8    the theory of successor liability, which is addressed in later portions of this order).  The

9    FAC alleges that "OEM Group appeared to have delegated the performance of the Contract

10   to Plasma-Therm, and Plasma-Therm assumed it."  (Doc. 19 ¶ 36.)  In addition, the FAC

11   alleges concrete facts supporting this inference, such as that "Plasma-Therm and OEM

12   Group jointly issued a letter" informing customers that Plasma-Therm had acquired OEM's

13   "'MRC Eclipse' product line" and that Plasma-Therm would "assume[] the responsibility

14   to complete all open orders for spare parts, upgrades, refurbishments, and new system

15   builds."  (*Id.* ¶¶ 37-38.)    The letter also allegedly contained information informing

16   customers how to contact Plasma-Therm if the customer had "an open PO [purchase order]

17   . . . for . . . a new system."  (*Id.* ¶ 40.)  Separately, the FAC alleges that Plasma-Therm

18   "engaged in numerous discussions" with Plaintiff (*id.* ¶ 42) and initially represented that it

19   would cure OEM's defective performance (*id.* ¶¶ 43-44).  All of these allegations support

20   an inference that Plasma-Therm had an express or implied agreement to assume OEM's

21   liabilities with regard to the Contract.  *See generally Catalina Groves v. Oliver*, 236 P.2d

22   1022, 1025 (Ariz. 1951) ("By reason of assumption by appellant of the duties of the lessee,

23   it became liable for the obligations of the lease . . . ."); *Shreve Land Co., Inc. v. J & D Fin.

24   Corp.*, 421 So. 2d 722, 724 (Fla. Dist. Ct. App. 1982) ("The law is well settled that an

25   assignee succeeds to his assignor's rights under the assignment of a contract and takes it

26   with all the burdens to which it is subject in the hands of the assignor."); Restatement

27   _____

28   written notice" under Rule 44.1 be "reasonable."  However, the advisory committee's notes
     explain that these 2007 amendments were "intended to be stylistic only."

(Second) of Contracts § 328 (1981) ("Unless the language or the circumstances indicate the contrary, the acceptance by an assignee of such an assignment operates as a promise to the assignor to perform the assignor's unperformed duties, and the obligor of the assigned rights is an intended beneficiary of the promise.").

4.    Application Of The CISG To Plasma-Therm

Notwithstanding the analysis above, and although Plaintiff is not required to allege the applicable law to survive a motion to dismiss, Plaintiff is the master of its complaint and has chosen to specifically plead Count Two as a breach of contract under the CISG. (Doc. 19 ¶ 62 ["Article 30 of the CISG requires Defendants to perform its contract obligations . . . ."]; *id* ¶ 65 ["Defendants' conduct amounts to a fundamental breach of contract under Article 25 of the CISG."].)  But as discussed in earlier portions of this order, the CISG only applies to buyers and sellers and does not apply to third parties who are assigned rights and obligations under an existing contract.  Because Plasma-Therm is such a third-party, the CISG does not apply, and Plaintiff has failed to state a claim for breach of contract against Plasma-Therm.[17]

Plasma-Therm is wrong, however, that this "common ground" for dismissal has any bearing on Count Three or Count Four.  Unlike in Count Two, Plaintiff does not specifically allege that Counts Three and Four arise under the CISG.  Instead, Count Three is styled as a claim for "breach of the covenant of good faith and fair dealing" and none of the allegations contained in that count expressly reference the CISG.  (Doc. 19 at 10-11, capitalization omitted.)[18]  Count Four, likewise, is styled as a claim for "unjust enrichment"

---

[17]    Because Plasma-Therm is dismissed from Count Two, it is unnecessary at this juncture of the case to address Plasma-Therm's other arguments regarding why it should be dismissed from this count.  (*Cf.* Doc. 22 at 12-13.)  It is also unnecessary to discuss how these arguments apply to OEM.  Fed. R. Civ. P. 7(b) ("A request for a court order must be made by motion[;] . . . state with particularity the grounds for seeking the order; and . . . state the relief sought.").  (*See also* Doc. 22 at 10 [Plasma-Therm's motion, arguing only that "counts II-IV fail to state a claim *against Plasma-Therm*"], emphasis added, capitalization omitted; Doc. 23 [OEM's motion, arguing only for dismissal of Count One].)

[18]    Although the first paragraph within Count Three incorporates by reference all of the previous allegations in the FAC (Doc. 19 ¶ 67), this seems too slender of a basis for

which is pleaded "in the alternative to breach of contract." (*Id.* at 11, capitalization omitted.)

Finally, to the extent Plasma-Therm argues there is no subject-matter jurisdiction over Count Three and Count Four as applied to Plasma-Therm, that argument lacks merit for the reasons explained in earlier portions of this order.

### 5.    "Shotgun Pleading"

Plasma-Therm also argues the FAC should be dismissed because it is a "shotgun pleading." Although this doctrine is not fully developed in the Ninth Circuit, some district courts have found that a plaintiff's complaint violates Rule 8 when it "is so wide ranging with respect to time, claims, defendants, and venue" that it is impossible for the defendant to file an appropriate response. *Shehee v. California*, 2010 WL 4880698, *2 (E.D. Cal. 2010). *See also Physicians Care All., LLC v. All Day Beauty, LLC*, 2019 WL 176782, *2 (D. Ariz. 2019) ("Shotgun pleadings are pleadings that overwhelm defendants with an unclear mass of allegations and make it difficult or impossible for defendants to make informed responses to the plaintiff's allegations.") (citation omitted). To determine whether a complaint qualifies as a "shotgun pleading," courts look to Rule 10(b) for guidance, which requires that:

> A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense.

Fed. R. Civ. P. 10(b). Importantly, however, a complaint does not qualify as a shotgun pleading "simply because it incorporates by reference previous allegations"; rather, it "must incorporate all or nearly all of the previous allegations *and make no attempt to lay out which conduct constitutes the violation alleged*." *Physicians Care All., LLC*, 2019 WL 176782 at *2 (cleaned up) (emphasis added).

---

concluding that Count Three is necessarily predicated solely on the CISG.

The FAC in this case does not meet this definition because it is not "so wide ranging with respect to time, claims, defendants, and venue" that it is impossible for Plasma-Therm to file an appropriate response. *Shehee*, 2010 WL 4880698 at \*2. In *Shehee*, a prisoner filed a complaint against various prison officials and medical personnel detailing "wide-ranging instances of allegedly unconstitutional conduct, pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution." *Id.* "The allegations . . . span[ned] more than twelve years and encompass[ed] three federal venues." *Id.* In this case, by contrast, Plaintiff alleges only three substantive claims, all of which are related to a single purchase contract and to Defendants' conduct within a relatively narrow time period (*i.e.*, from 2019 to 2022). Although it's true that each of Plaintiff's three substantive claims "adopts and realleges the allegations contained in the above paragraphs as if set forth fully [t]herein" (Doc. 19 ¶¶ 57, 67, 72), the body of the FAC outlines which conduct is attributable to Plasma-Therm and which conduct is attributable to OEM. With regard to Plasma-Therm, specifically, the FAC alleges:

> 35.    . . . Plasma-Therm acquired OEM Group's dry process equipment business, including the Eclipse product line, in Arizona . . . .
>
> 36.    . . . OEM Group appeared to have delegated the performance of the Contract to Plasma-Therm, and Plasma-Therm assumed it.
>
> 42.    In December 2020, [Plaintiff] and Plasma-Therm began engaging in the hope that OEM Group and Plasma-Therm would perform their obligations under the Contract.
>
> 43.    For the next year, and through the end of 2022, [Plaintiff] engaged in numerous discussions with Plasma-Therm, asking that it cure the incomplete performance.
>
> 44.    After initially representing that they would cure, Plasma-Therm eventually claimed that Chamber 3 of the Eclipse was not actually included in the Contract, which contradicts the express contract terms.

(Doc. 19 ¶¶ 35-36, 42-44.) This is not a complaint where a plaintiff makes no attempt to lay out which conduct constitutes the violation alleged. Instead, to the extent there is any ambiguity over what conduct is attributable to Plasma-Therm, that ambiguity appears inevitable under Plaintiff's theory that Plasma-Therm assumed the Contract between

Plaintiff and OEM.  It remains to be seen what conduct is attributable to Plasma-Therm and what conduct is attributable to OEM under of the terms of the APA; however, nothing prohibits Plaintiff from alleging that either or both Defendants are liable for this same conduct.  Fed. R. Civ. P. 8(d) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.").

### 6.    Successor Liability

To the extent the FAC alleges that Plasma-Therm is liable in any count under a theory of successor liability, the FAC fails to state a claim.  The "general rule" is that "a purchaser of assets does not acquire a seller's liabilities."  *Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1090 (9th Cir. 2015).  However, "[m]ost states have adopted exceptions to the general no-liability rule that allow creditors to pursue the successor if the 'sale' is merely a merger or some other type of corporate reorganization that leaves real ownership unchanged." *Carpenters Health & Sec. Tr. of W. Washington v. Paramount Scaffold, Inc.*, 159 F. Supp. 3d 1229, 1234 (W.D. Wash. 2016) (citation omitted).  In Arizona, "when a corporation sells or transfers its principal assets to a successor corporation, the latter will not be liable for the debts and liabilities of the former, unless (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation [or reincarnation] of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *A.R. Teeters & Assocs., Inc. v. Eastman Kodak Co.*, 836 P.2d 1034, 1039 (Ariz. Ct. App. 1992).  *See also Louisiana-Pac. Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1263 (9th Cir. 1990), *overruled on other grounds by Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358 (9th Cir. 1997) (characterizing these same exceptions as the "traditional rules of successor liability in operation in most states").[19]

---

[19]    It's unclear whether Plasma-Therm is arguing for the application of Arizona (or

Here, as a threshold matter, the FAC does not allege that Plasma-Therm acquired OEM's "principal assets." Although Plaintiff argues in its response brief that "Plasma-Therm bought all of OEM's revenue-producing assets" (Doc. 28 at 28), the FAC only alleges that Plasma-Therm acquired "OEM Group's Dry Business . . . which acquisition included the 'MRC Eclipse' product line" (Doc. 19 ¶ 37). Because the scope of OEM's business operations is not alleged in the FAC, it is not reasonable to infer that OEM's "Dry Business" and the Eclipse product line are its principal assets. (For the reasons stated above, Plasma-Therm might still be liable for OEM's obligations under the Contract; however, Plasma-Therm's assumption of a single contract does not transform it into OEM's "successor.")

The FAC also fails to allege facts supporting an inference of successor liability based on a "de-facto" merger theory.[20] "[C]ourts nationwide are in accord as to the factors for finding a *de facto* merger: (1) continuity of management, personnel, physical location, assets, and general business operations between the buyer and seller corporations; (2) continuity of shareholders; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." *Tillman v. Everett*, 2020 WL 1904637, *2 (D. Ariz 2020) (collecting cases). A de facto

_____

some other state's) law or federal common law to determine the existence/non-existence of successor liability. The only case cited by Plasma-Therm to support the application of federal common law deals with federal maritime law and is thus inapplicable. *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021). *See also Rodriguez v. Fed. Deposit Ins. Corp.*, 589 U.S. 132, 136 (2020) ("In contexts like [admiralty disputes and certain controversies between states], federal common law often plays an important role. But before federal judges may claim a new area for common lawmaking, strict conditions must be satisfied.").

[20]    Plaintiff does not appear to argue that a true merger took place between Plasma-Therm and OEM. (Doc. 28 at 27 [arguing that, in the context of specific jurisdiction, "Plasma-Therm is a prototypical successor under either the express assumption or 'de-facto' consolidation prongs of the above framework"].)

merger can also occur when two corporations attempt to complete a merger but fail to timely record a copy of their merger agreement. *Provident Sec. Life Ins. Co. v. Gorsuch*, 323 F.2d 839, 845-46 (9th Cir. 1963) (interpreting Arizona law). The FAC does not allege that Plasma-Therm and OEM tried or failed to complete a statutory merger. Instead, the FAC alleges facts suggesting that Plasma-Therm purchased certain assets from OEM (Doc. 19 ¶ 37), continued to employ certain OEM personnel (*id.* ¶ 39), continued operating in Arizona (*id.* ¶ 41), and assumed some of the responsibilities necessary for the continuation of OEM's business operations (*i.e.*, "responsibility to complete all open orders for spare parts, upgrades, refurbishments, and new system builds") (*id.* ¶ 38). The FAC does not, in contrast, allege facts suggesting that OEM ceased its ordinary business operations, liquidated, and dissolved its business,[21] or that there is a continuity of shareholders between Plasma-Therm and OEM. These two factors are particularly important. *See, e.g.*, *Tillman*, 2020 WL 1904637 at *2 ("While some courts hold that not all factors must be met, they consistently require continuity of shareholders, accomplished by paying for the acquired corporation with shares of stock.") (cleaned up). Even assuming that all of the FAC's allegations are true, it is not reasonable to infer that OEM functionally merged with Plasma-Therm simply because Plasma-Therm purchased assets from OEM and continued some of OEM's business operations in Arizona.

C.    **Count Three**

1.    The Parties' Arguments

Count Three is for a breach of the covenant of good faith and fair dealing. (Doc. 19 ¶¶ 67-71.) Plasma-Therm moves to dismiss Count Three because it is "brought under the CISG" and argues that Plaintiff is "precluded from invoking any other law" because "the CISG preempts conflicting UCC and state contract laws within its scope" and "Plaintiff's failure to cite any law beyond the CISG waives any argument that another law applies."

---

[21]    Although Plaintiff argues that "OEM has wound down operations in the aftermath of the sale to [Plasma-Therm]" (Doc. 28 at 32), Plaintiff does not cite any allegations in the FAC and appears to rely instead on ambiguous portions of the APA.

1   (Doc. 22 at 12-13.)   Further, Plasma-Therm argues that "CISG Article 7(1) does not

2   establish an affirmative duty of good faith" nor does the CISG cover tort claims "so a claim

3   for the tortious breach of the implied covenant is unsupported." (*Id.* at 13.)  Plasma-Therm

4   also argues that, even if state law did apply in this case, Count Three would still fail to state

5   a claim because "there was no: (1) alleged conduct by Plasma-Therm separate from the

6   alleged breach of Contract; and (2) . . . no alleged contractual privity between Plasma-

7   Therm and Plaintiff." (*Id.*)

8       In response, Plaintiff argues that "[t]he Convention directs that its interpretation be

9   informed by 'its international character and . . . the need to promote uniformity in its

10  application and the observance of good faith in international trade'" and that, as a result,

11  "[t]he CISG imposes a duty of good faith and fair dealing." (Doc. 28 at 34, citations

12  omitted.)  Plaintiff also argues that "contrary to Plasma-Therm's argument that it is a mere

13  'third party,' it has stepped into OEM's shoes." (*Id.* at 32.)

14      In reply, Plasma-Therm argues in general terms that Count Three fails to state a

15  claim and that Plaintiff's counterarguments are ineffectual.  (Doc. 31 at 5.)

16          2.   Analysis

17      For the reasons discussed in earlier portions of this order, the CISG does not apply

18  to Plasma-Therm and the FAC fails to plead facts sufficient to support an inference that

19  Plasma-Therm may be held liable for OEM's contractual liabilities under a successor

20  liability theory.  Count Three is therefore dismissed to the extent it states a claim for breach

21  of the covenant of good faith and fair dealing grounded in the CISG or under a successor

22  liability theory.  However, for the reasons also discussed in earlier portions of this order,

23  Plasma-Therm is incorrect that "Plaintiff's failure to cite any law beyond the CISG waives

24  any argument that another law applies." (Doc. 22 at 12.)  The Court, therefore, will

25  consider whether Plaintiff has stated an implied-covenant claim grounded in state law.

26      The covenant of good faith and fair dealing, which is a term implied in all contracts,

27  "prohibits a party from doing anything to prevent other parties . . . from receiving the

28  benefits and entitlements of the agreement." *Wells Fargo Bank v. Ariz. Laborers,*

*Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 28 (Ariz. 2002). The implied covenant "arises by operation of law but exists by virtue of a contractual relationship" and is "as much a part of a contract as are the express terms." *Id.* A party breaches the implied covenant by engaging in conduct that denies the other party its "reasonable expectation[s]" under the contract. *Great W. Bank v. LJC Dev., LLC*, 362 P.3d 1037, 1046 (Ariz. Ct. App. 2015). "A party can breach the implied covenant of good faith and fair dealing without breaching an express provision of the underlying contract." *United Dairymen of Ariz. v. Schugg*, 128 P.3d 756, 760-61 (Ariz. Ct. App. 2006).

Here, Plaintiff alleges that Plasma-Therm, through its conduct, denied Plaintiff its reasonable expectations under the Contract. Specifically, Plaintiff alleges that, "[i]n addition to breaching the express terms of the Contract . . . Defendants led Plaintiff to believe that they would complete the installation and delivery of the Eclipse, including all necessary components and on-site engineering support, as required under the Contract, when in fact, Defendants had no intention of fulfilling these obligations, choosing instead to avoid them." (Doc. 19 ¶¶ 68-69.) Plaintiff also alleges that Defendants "breached their duty, by stalling for over three years to perform their obligations and eventually, in bad faith, rescinding their promise to provide the necessary components and necessary and on-site support for the function of the Eclipse." (*Id.* ¶ 70.) Specifically with regard to Plasma-Therm, Plaintiff alleges that "[a]fter initially representing that they would cure, Plasma-Therm eventually claimed that Chamber 3 of the Eclipse was not actually included in the Contract, which contradicts the express contract terms." (*Id.* ¶ 44.)

These allegations are sufficient to state a claim. In *Colson v. Maghami*, 2010 WL 2744682 (D. Ariz. 2010), a plaintiff sued two luxury car dealerships and the dealerships' owner after he attempted to purchase "a limited edition Reventon Lamborghini." *Id.* at *1. The plaintiff made a deposit with one of the dealerships for $500,000 and then submitted an application directly to Lamborghini; however, the plaintiff was placed on a waiting list and never received a Reventon. *Id.* At summary judgment, the court found a material issue of fact regarding whether defendants breached the implied covenant in part because of

evidence that defendants "fail[ed] to inform plaintiff about the status of Reventons [or] his place on any waiting list," and that one of the defendants "'deliberately refused' to communicate the fact that the dealership 'would not be immediately receiving a car,' and instead kept [plaintiff's] money and avoided his inquiries for eight months." *Id.* at *5-6. Here, similarly, Plaintiff alleges that Plasma-Therm intentionally delayed performance and failed to inform Plaintiff about the status of the Eclipse and Plasma-Therm's lack of intention to cure OEM's defective performance. Drawing all reasonable inferences in Plaintiff's favor, it's plausible that this type of delay and lack of transparency constitutes a breach of the implied covenant.

Plasma-Therm argues that Count Three fails to state a claim because the FAC does not allege any conduct by Plasma-Therm other than a breach of the Contract's express terms. But as discussed above, the FAC alleges that Plasma-Therm delayed performance and misled Plaintiff. Although the exact meaning of the Contract is not yet certain, it is unclear that this delay and lack of transparency would, on its own, constitute an ordinary breach.

Plasma-Therm also argues that any state-law claim for a breach of the implied covenant is preempted by the CISG. "As a treaty to which the United States is a signatory, the CISG is federal law; thus, under the Supremacy Clause, it preempts inconsistent provisions of state law where it applies. However, the CISG will not preempt state law causes of action that fall outside the scope of federal law." *Kumpers*, 2025 WL 603734 at *9 (cleaned up). Here, the Court has determined that the CISG does not apply to Plaintiff's claims against Plasma-Therm. It follows that the CISG does not preempt Count Three.

Last, Plasma-Therm is incorrect that Plaintiff has failed to allege contractual privity between Plaintiff and Plasma-Therm as required to state a claim. As discussed elsewhere in this order, Plaintiff has adequately alleged that Plasma-Therm assumed OEM's obligations under the Contract. Because the covenant of good faith and fair dealing is "as much a part of a contract as are the express terms," the covenant is assumed alongside the Contract's other express obligations. *Cf. Wells Fargo Bank*, 38 P.3d at 28.

1        D.    **Count Four**

2             1.   <u>The Parties' Arguments</u>

Count Four is a claim for unjust enrichment. (Doc. 19 ¶¶ 72-78.) Regarding Count Four, Plasma-Therm argues, once again, that "Plaintiff has failed to provide sufficient notice to apply anything other than the CISG, which preempts state law tort claims." (Doc. 22 at 13.) Alternatively, Plasma-Therm argues that Count Four fails because 1) "any benefit conferred was to OEM, not Plasma-Therm"; 2) "Count IV is devoid of essential facts showing the absence of a legal remedy and enrichment to Plasma-Therm;" 3) "Count IV is based on the terms of the Contract, alleged to bind Plasma-Therm, so a legal remedy exists"; and 4) "there are no allegations showing the relationship between Plaintiff and Plasma-Therm." (*Id.* at 13-14.)

In response, Plaintiff argues that Count Four "is alleged 'in the alternative to breach of contract'" so "[i]t only exists if the other claims have failed." (Doc. 28 at 34.) Plaintiff also argues that "Plasma-Therm is OEM's successor, so the extent to which OEM was enriched, Plasma-Therm was too. For example, OEM's assets, which presumably were 'enriched' by [Plaintiff's] payments to OEM, ended up with Plasma-Therm. In so far as the 'extent' of enrichment is at issue, that is for discovery." (*Id.*)

In reply, Plasma-Therm argues in general terms that Count Four fails to state a claim and that Plaintiff's counterarguments are ineffectual. (Doc. 31 at 5.)

             2.   <u>Analysis</u>

For the reasons discussed above, Plasma-Therm is incorrect that Plaintiff's failure "to provide sufficient notice to apply anything other than the CISG" prevents the Court from assessing the sufficiency of Count Four. (Doc. 22 at 13.)[22] The Court, therefore, will consider whether Plaintiff has succeeded in stating a state-law claim for unjust enrichment.

In Arizona, an unjust enrichment claim has "five elements: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the

---

[22]     In addition, for the reasons discussed in relation to Count Three, Plasma-Therm is incorrect that the CISG preempts a claim for unjust enrichment.

absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law." *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011). "Thus, a plaintiff must demonstrate that the defendant received a benefit, that by receipt of that benefit the defendant was unjustly enriched at the plaintiff's expense, and that the circumstances were such that in good conscience the defendant should provide compensation." *Id.* The plaintiff need not allege that the defendant was benefited directly so long as "plaintiff can establish [that] the relationship between his detriment and the defendant's benefit flow from the challenged conduct." *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1176 (N.D. Cal. 2015) (cleaned up). However, "[t]o state a claim for unjust enrichment, the plaintiff must confer a benefit *to the defendant*, not a third party." *Physicians Surgery Ctr. of Chandler v. Cigna Healthcare Inc.*, 609 F. Supp. 3d 930, 940 (D. Ariz. 2022) (emphasis added).

Plaintiff has failed to state a claim for unjust enrichment because the FAC fails to allege that Plasma-Therm received any benefit from Plaintiff. Plaintiff's theory appears to be that Plasma-Therm benefited from Plaintiff's impoverishment because OEM benefited from that impoverishment and Plasma-Therm, in turn, acquired all of OEM's assets, which included whatever benefits OEM may have previously received. (Doc. 28 at 34 ["OEM's assets, which presumably were 'enriched' by [Plaintiff's] payments to OEM, ended up with Plasma-Therm."].) But this theory is not supported by allegations in the FAC. As discussed elsewhere in this order, Plaintiff argues in its response brief that "Plasma-Therm bought all of OEM's revenue-producing assets" (*id.* at 28); however, the FAC only alleges that Plasma-Therm acquired "OEM Group's Dry Business . . . which acquisition included the 'MRC Eclipse' product line" (Doc. 19 ¶ 37). It is not reasonable to infer that, merely because Plasma-Therm acquired certain assets from OEM, those same assets were enriched by Plaintiff's earlier impoverishment. Such an inference is particularly tenuous where, as here, Plaintiff's alleged impoverishment was in the form of two cash payments and Plaintiff has not explained how those payments enriched any of the specific assets that Plasma-Therm is alleged to have acquired.

Instead, this case is analogous to situations where a plaintiff's impoverishment unjustly benefits a third party other than the defendant.  In *A M Leasing, Ltd. v. Baker*, 786 P.2d 1045 (Ariz. Ct. App. 1989), a leasing company leased a backhoe to its co-defendant, Griffin, who later brought the backhoe to repair shop.  *Id.* at 1046.  When Griffin defaulted on his lease payments, the leasing company took possession of the backhoe and the repair shop sought to recover detachable parts that were added to the backhoe but never paid for. *Id.*  The Arizona Court of Appeals ultimately rejected the repair shop's theory of unjust enrichment because the leasing company "received no more than it was entitled to receive under its contract with Griffin—the return of its backhoe in good repair—a benefit for which it gave consideration by fully performing its obligations to Griffin."  *Id.* at 1050.  In so holding, the court drew a distinction between cases where the defendant retains a benefit conferred by the plaintiff and "pays no one or renders only partial payment" and cases where the defendant "gave consideration for the benefit received," finding that "[t]he plaintiff prevails only in the first group of cases, for only in those may it fairly be said that the defendant has been unjustly enriched."  *Id.* at 1049-50.  Here too, Plaintiff argues that Plasma-Therm purchased certain assets from OEM and received, as part of that purchase, benefits that were unfairly conferred on OEM.  However, in the same way that the leasing company in *A M Leasing* provided valuable consideration to Griffin for the return of its backhoe, it appears that Plasma-Therm provided valuable consideration to OEM when it purchased OEM's assets.

Nor may Plasma-Therm be held liable for OEM's unjust enrichment under an assumption-of-the-contract or successor liability theory.  "[I]f there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application."  *Trustmark Ins. Co. v. Bank One, Ariz.*, 48 P.3d 485, 491-93 (Ariz. Ct. App. 2002) (cleaned up).  Therefore, if Plaintiff is correct that Plasma-Therm assumed the Contract and that the Contract governs the relationship between Plaintiff and Plasma-Therm, then Plaintiff's unjust enrichment claim fails as a matter of law.  True, where the validity of a relevant contract is disputed and the plaintiff has not yet received the benefit

of the bargain, a plaintiff may plead an unjust enrichment claim in the alternative pending a ruling on the contract's validity.  Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").  But such an alternative pleading fails to state a claim here because, as noted, Plaintiff has failed to allege that Plasma-Therm received any benefit from Plaintiff.

## IV.   Leave To Amend

In its response, Plaintiff "respectfully requests an opportunity to amend" in the event of dismissal.  (Doc. 28 at 34.)  Plasma-Therm does not appear to challenge this request.

Rule 15(a) of the Federal Rules of Civil Procedure "advises the court that 'leave [to amend] shall be freely given when justice so requires.'"  *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted).  "This policy is 'to be applied with extreme liberality.'"  *Id.* (citation omitted).  Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."  *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).  Applying these standards, Plaintiff's request for leave to amend is granted except as to Count One, because amendment as to that Count would be futile.

Accordingly,

**IT IS ORDERED** that:

1.    Plaintiff's request to compel arbitration (Doc. 19 ¶¶ 53-56) and cross-motion to compel arbitration (Doc. 28) are **denied**.

2.    OEM's motion to dismiss (Doc. 23) is **granted**.  Count One of the FAC is dismissed as to OEM without leave to amend.

3.    Plasma-Therm's motion to dismiss (Doc. 22) is **granted in part and denied in part**.  More specifically, Plaintiff's claim against Plasma-Therm in Count One is dismissed in full; Plaintiff's claim against Plasma-Therm in Count Two is dismissed in full; Plaintiff's claim against Plasma-Therm in Count Three is dismissed in part (only to the extent it is predicated on the CISG or on a theory of successor liability); and Plaintiff's

claim against Plasma-Therm in Count Four is dismissed in full.  Plaintiff is granted leave to amend only as to Counts Two, Three, and Four.

4.    Within 14 days of the issuance of this order, Plaintiff may file a Second Amended Complaint ("SAC").  If Plaintiff files a SAC, the changes shall be limited to attempting to cure the deficiencies raised in this order and Plaintiff shall, consistent with LRCiv 15.1, attach a redlined version of the pleading as an exhibit.

Dated this 3rd day of July, 2025.

Dominic W. Lanza
United States District Judge